**Seshadri RAJU, M.D.**

v.

**Robert S. RHODES, M.D.**

**Civ. A. No. J92–0206(L)(N).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Nov. 20, 1992.

---

1230

Ed Davis Noble, M. Curtis McKee, Fuselier, Ott, McKee & Shivers, George H. Ritter, George Q. Evans, Wise, Carter, Child & Caraway, Jackson, MS for plaintiff.

Samuel L. Begley, John Maxey, Maxey, Pigott, Wann & Begley, Jackson, MS, for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant Robert S. Rhodes, M.D., to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Alternatively, defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Plaintiff Seshadri Raju, M.D., has responded to the motion and the court has considered the memoranda of authorities together with attachments submitted by the parties in ruling on the motion. The court concludes that defendant's motion is well taken and summary judgment should be granted in his favor.

### FACTUAL BACKGROUND

This case arises out of the reorganization of the Department of Surgery at the University of Mississippi Medical Center (UMC), a teaching hospital and a division of the State of Mississippi. The parties to this dispute are both employees of UMC. Plaintiff Seshadri Raju is a Professor of Surgery and member of the Department of Surgery, where he has been employed since 1972. Defendant Robert S. Rhodes has at all times material to this dispute been the Chairman of the Department of Surgery at UMC and, as such, plaintiff's departmental and academic supervisor.

In 1988, during his first year at UMC, defendant made several administrative changes in the Department of Surgery operations, one of which was to propose to surgeons in the department a "Management Services Agreement" under which defendant agreed to provide management services for income derived from participating staff members' outside practice of medicine.[2] According to Dr. Raju, he reluctant-

---

1. Both parties have submitted evidence beyond the pleadings and the court has therefore considered defendant's motion as one for summary judgment.

2. In addition to their teaching duties, physicians serving on the faculty at UMC are permitted to engage in the private practice of medicine. Professors conducting an outside practice, however, must do so pursuant to an income sharing agreement which is the subject of a contractual agreement between the physician faculty member and UMC. This contract requires that any income in excess of $120,000 that a professor makes as a result of outside medical practice be divided between both the physician and UMC, with each party receiving fifty percent. At the

ly entered into such an agreement with Dr. Rhodes on June 13, 1989.[3]

Subsequently, in October of 1990, Dr. Rhodes, acting in his capacity as Chairman of the Department of Surgery, made several changes in the operation of the UMC Transplant Program, one of which was the removal of Dr. Raju from the position of Director of the Transplant Program, a position which he had held since 1980. Additionally, as part of the reorganization of the program, Dr. Rhodes established individual organ transplant teams consisting of different groups of surgeons and internists, permitted transplant surgery only if an intensive care unit bed were available prior to surgery, and temporarily suspended extra-renal transplants. Dr. Raju, who was to become Chief of Lung Transplantation and Chief of Liver Transplantation, was displeased with all of these changes, including his removal from the directorship and reassignment to the above positions. He therefore filed a grievance complaint through the proper channels at UMC seeking to enjoin all of Dr. Rhodes' actions. Dr. Raju alleged in his grievance that certain of Dr. Rhodes' decisions and actions concerning the reorganization of the Transplant Program, among other things, resulted in Dr. Raju's demotion, adversely affected patient care, and subjected him to harassment by Dr. Rhodes.

The first step of Dr. Raju's grievance procedure began with Dr. Rhodes, as Chairman of the Department of Surgery. Dr. Rhodes, disagreeing with Dr. Raju's perception of the events surrounding the reorganization, concluded that the grievance was without merit. Next, Dr. Raju appealed to Dr. Carl G. Evers, Associate Dean for Academic Affairs. Dr. Evers likewise found no merit in Dr. Raju's allegations. Dr. Raju thereafter appealed to Dr. Norman Nelson, Vice Chancellor for Health Affairs, who appointed a faculty grievance committee to investigate Dr. Raju's allegations. The faculty grievance committee heard evidence from a number of people involved in the Transplant Program and concluded unanimously that Dr. Raju's grievance against Dr. Rhodes lacked merit. Dr. Nelson concurred in the committee's opinion.

After exhausting all administrative remedies at the institutional level, Dr. Raju requested review by the Board of Trustees of State Institutions of Higher Learning (Board of Trustees), which considered Dr. Raju's grievance and determined that (a) the UMC due process procedures were followed, and (b) UMC's decision was not arbitrary and capricious. The Board of Trustees thus affirmed the grievance committee's finding of no merit in Dr. Raju's claim against Dr. Rhodes.

Aggrieved by the Board of Trustees' decision, Dr. Raju perfected an appeal to the Circuit Court of the First Judicial District of Hinds County, Mississippi, as provided in Miss.Code Ann. § 11–51–95 (1972). Dr. Raju, in seeking to overturn the Board of Trustees' decision not to enjoin UMC's reorganization of its Transplant Program, claimed:

I. The decision will have an adverse impact on the current future prospects for the Medical Center;

II. The decision was arbitrary as the evidence gathered during the grievance procedure clearly does not support the conclusion reached; and

III. The decision was tainted by serious violations of due process which occurred during the grievance procedure.

The circuit court, finding that Dr. Raju's grievance had no merit, that there was substantial evidence to support the Board of Trustees' decision, and that all proceedings were in accord with due process, affirmed the decision of the Board of Trustees.

Prior to the circuit court's denial of his appeal, plaintiff filed a separate state court action against Dr. Rhodes asserting, in re-

---

time this dispute arose, plaintiff was under such a contract with UMC.

**3.** According to Dr. Raju, prior to this time he was free to manage his own accounts, collections and expenses associated with his private practice.

gard to the Management Services Agreement between he and Dr. Rhodes, claims for breach of contract and tortious interference with business and contractual relations. Subsequently, yet still prior to the circuit court's decision, plaintiff amended his complaint to include a claim for damages against Dr. Rhodes in his individual capacity under 42 U.S.C. § 1983 for violation of his due process rights under the Fourteenth Amendment. Specifically, as grounds for his § 1983 claim, Dr. Raju alleged that Dr. Rhodes' actions in reorganizing the Transplant Program at UMC deprived him of property interests in his position as Director of the Transplant Program and profits from his private practice, as well as liberty interests in the management of his practice, career and income, all of which were denied him without a predeprivation hearing. Dr. Raju also alleged a violation of his substantive due process rights, contending that as a result of the alleged "arbitrary, capricious and unreasonable" actions of Dr. Rhodes in reorganizing the Transplant Program, he is no longer a world renowned transplantation surgeon, but rather, "is now relegated to the genre of a garden variety transplant surgeon." Once Dr. Raju's state court complaint was amended to include claims under § 1983, Dr. Rhodes removed the case to this court and now seeks summary judgment as to all claims asserted against him.

As the primary bases for his motion, Dr. Rhodes contends that certain factual issues decided by the UMC faculty grievance committee, and later adopted by the Circuit Court of Hinds County as part of its judgment affirming the Board of Trustees' decision, must be accorded collateral estoppel effect by this court. Consequently, according to Dr. Rhodes, this court is compelled to dismiss him from this action on the ground that, as a public official who did not

violate Dr. Raju's clearly established constitutional rights, he is immune from suit as a matter of law with respect to all of plaintiff's state law and § 1983 claims. Dr. Rhodes further argues that, on their merits, none of Dr. Raju's claims meet the heightened standards of pleading and proof required to overcome his qualified immunity. *See Elliott v. Perez*, 751 F.2d 1472, 1478 (5th Cir.1985).

### LEGAL ANALYSIS

A. *Must the judgment of the state court affirming the findings of the Board of Trustees and faculty grievance committee be given preclusive effect in this federal court litigation?*

It is undisputed that the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state from which the judgments emerged. *See, e.g., Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Under the doctrine of collateral estoppel, the preclusion doctrine at issue in this case, "once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982) (citations omitted).[4]

Whether a judgment is entitled to preclusive effect under § 1738 depends on whether the party against whom the state court judgment was rendered had a full and fair opportunity to litigate the claim at issue. *Allen*, 449 U.S. at 95, 101 S.Ct. at

---

**4.** Although often discussed in terms of res judicata, collateral estoppel, also called "issue preclusion," is a separate preclusion doctrine from res judicata, also called "claim preclusion." Under principles of res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Allen*, 449 U.S. at 94, 101 S.Ct. at 414. In other words, res judicata prevents relitigation of claims; collateral estoppel ends controversy over issues. Contrary to res judicata, which precludes only subsequent suits on the same cause of action, collateral estoppel precludes relitigation of identical issues in later suits on any cause of action. *See* J. Friedenthal, M. Kane and A. Miller, *Civil Procedure* § 14.2, at 613 (1985).

415. In this regard, however, "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." *Kremer,* 456 U.S. at 481, 102 S.Ct. at 1897–98. In *Kremer,* the Supreme Court held that the State of New York's combined administrative hearing and judicial review procedures satisfied this test.[5] As stated by the Court: "It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect.... There is no requirement that judicial review proceed *de novo* if it is to be preclusive." *Id.* at 480 n. 21, 102 S.Ct. at 1896 n. 21.[6]

In the case *sub judice,* this court finds, in accordance with *Kremer,* that Mississippi's combined administrative hearing and judicial review proceedings satisfy the minimum procedural requirements of the Fourteenth Amendment Due Process Clause. The record in this cause reveals that UMC followed its grievance procedure, which included providing Dr. Raju notice and an opportunity to be heard through testimony and other evidence. Dr. Raju was also given the opportunity to present witnesses and to respond to the testimony of any adverse witness in writing and in person. The faculty grievance committee reached

its unanimous findings only after reviewing and considering the approximately 600 pages of transcribed testimony and numerous documents submitted by the parties. All of this evidence was before both the Board of Trustees and the Hinds County Circuit Court when each considered Dr. Raju's appeal of the committee's findings. Furthermore, it is readily apparent from its written opinion that the state court analyzed each of the committee's findings to determine whether the Board of Trustee's affirmance of those findings, as well as the Board's independent finding that there were no violations of due process during the proceedings at UMC, were supported by substantial evidence.[7] In the court's opinion, the proceedings pertaining to Dr. Raju's grievance against Dr. Rhodes were sufficient to "satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." *Id.* at 481, 102 S.Ct. at 1897–98.

The court's next task, in accordance with § 1738, is to determine whether the Mississippi law of collateral estoppel bars Dr. Raju's relitigation in the courts of the State of Mississippi of the issues decided by the faculty grievance committee and affirmed by both the Board of Trustees and the Circuit Court of Hinds County. If so, Dr.

---

**5.** In *Kremer,* the Court determined that a judgment in a New York state court judicial review proceeding, which rejected an employee's claim of discrimination under the New York Executive Law, barred the employee's subsequent federal court Title VII action. Since Title VII, like § 1983, did not repeal § 1738, the preclusive effect of the New York judgment was determined on the basis of New York's law of preclusion. Kremer sought to avoid preclusion of the Title VII claim on the grounds that the New York courts did not determine his Title VII rights, and the state court procedures were allegedly inadequate. The Court rejected both arguments.

Despite the fact that the state court dealt only with a state law claim, the Title VII claim was barred because the elements of the state and federal claims were virtually identical. The adverse state law ruling not only resolved that Kremer's state law claim was without merit, but also "that a Title VII claim arising from the same events would be equally meritless." *Kremer,* 456 U.S. at 480, 102 S.Ct. at 1896. Because the New York law of preclusion barred

Kremer's Title VII claim, the claim was barred in federal court as well.

**6.** Under *Kremer,* state court judicial review determinations commonly are afforded preclusive effect in federal court § 1983 actions; preclusive effect has even been given to state court judicial review determinations rendered under any evidence standard. *See* 1 M. Schwartz and J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 11.4, at 647 (2d ed. 1991) (citing cases); *Sykes v. McDowell,* 786 F.2d 1098, 1103 (11th Cir.1986) ("The teaching of *Kremer* is that federal courts must accord preclusive effect to issues litigated and decided on the merits, even though the review on the merits is sharply limited.").

**7.** Although it is not clear from the record as to at what stage in the grievance process Dr. Raju obtained counsel, it is apparent that he had obtained counsel by the time of his appeal to the circuit court.

Raju will be similarly precluded from litigating those issues in this case.

█ Under Mississippi law, collateral estoppel operates to bar litigation of an issue where four elements are satisfied: (1) the plaintiff is seeking to relitigate a specific issue; (2) the issue was already litigated in a prior action; (3) the issue was actually determined in the prior action; and (4) the determination of the issue was essential to the judgment in the prior action. *Dunaway v. W.H. Hopper & Assoc., Inc.*, 422 So.2d 749, 751 (Miss.1982). *See also Schuster v. Martin*, 861 F.2d 1369, 1371–72 (5th Cir.1988). In denying Dr. Raju's appeal and finding his grievance without merit, the circuit court affirmed the following findings relating to the decision of the Board of Trustees:

(1) All of Dr. Rhodes' actions pertaining to the reorganization of the Transplant Program were in the scope of his authority as Chairman of the Department of Surgery, were not arbitrary and capricious, and were not personal attacks on Dr. Raju;

(2) Dr. Rhodes' actions in reorganizing the Transplant Program were not arbitrary and capricious, but rather were based on legitimate medical, administrative and financial concerns;

(3) Dr. Raju was not demoted and neither his salary nor his duties were decreased as a result of the reorganization;

(4) There were no violations of due process during the proceedings at UMC.

█ It is apparent from the opinion of the circuit court that each of the above issues was actually litigated and determined in the state proceedings to which both Dr. Raju and Dr. Rhodes were parties.[8] It is also apparent that these findings were the basis for denying Dr. Raju's grievance. Had the state court determined that the findings were not supported by substantial evidence, the Board of Trustees' decision presumably would have been overturned and Dr. Raju's request for injunctive relief granted. Patently, the resolution of these issues was essential to the judgment of the circuit court. *See Schuster*, 861 F.2d at 1371–73.[9] Dr. Raju is therefore estopped under Mississippi law from relitigating these issues and this court, in the action presently pending, must accept the above findings by the state court in resolving the issues before this court.[10]

**8.** Although plaintiff has filed an appeal with the Mississippi Supreme Court seeking to overturn the judgment of the circuit court, under Mississippi law the pendency of an appeal has no effect on the preclusiveness of an administrative or judicial determination. *Smith v. Malouf*, 597 So.2d 1299 (Miss.1992).

**9.** The findings of the faculty grievance committee were affirmed by the circuit court and thus became part of that court's judgment. Consequently, since all four of the elements necessary for collateral estoppel to apply under Mississippi law have been met in the instant case, it is the circuit court's judgment which must be given preclusive effect in this federal litigation. *See Schuster*, 861 F.2d at 1371–73. The court further notes that decisions by state agencies acting in a quasi-judicial capacity are also accorded preclusive effect under both federal and Mississippi law. *See University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986); *Hood v. Mississippi Dep't. of Wildlife Conservation*, 571 So.2d 263, 268–69 (Miss.1990).

**10.** Plaintiff argues that because the relief sought in this federal action (monetary damages) is different from that sought in the state proceed-

ings (injunctive relief), collateral estoppel does not apply to the findings of the state court. This argument was rejected by the Fifth Circuit in *Schuster*, 861 F.2d at 1372, and therefore, does not aid the plaintiff in this cause.

Additionally, plaintiff argues that collateral estoppel should not apply since he could not have brought either his state law or § 1983 claims in the state proceedings. This argument is also unpersuasive. Although it is true that Dr. Raju could not appropriately have asserted these "claims" in the state administrative and judicial review proceedings, this court's ruling giving preclusive effect to the findings of the state court is based on the doctrine of collateral estoppel (issue preclusion), not on the doctrine of res judicata (claim preclusion). In other words, specific issues were litigated between these parties in the state proceedings which would have to be both relitigated and decided differently in this action in order for Dr. Raju to prevail on his present claims. As such, the doctrine of collateral estoppel applies to preclude Dr. Raju from relitigating those issues. *See supra* at note 4. Though the "claims" asserted in the two proceedings may be different, the underlying issues required to be litigated in

**B.** *Given the preclusive effect of the issues previously determined by the state court, is Dr. Rhodes entitled to qualified immunity as to plaintiff's procedural and substantive due process claims under 42 U.S.C. § 1983?*

▉▉▉▉ The court is of the opinion that the preclusive effect of the circuit court judgment forecloses Dr. Raju's overcoming Dr. Rhodes' qualified in order to sustain his § 1983 claim. In a § 1983 action against a public official, the plaintiff bears the burden of alleging and proving that the defendant's conduct violated "clearly established" constitutional law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity shields government officials "from civil damages liability so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Anderson*, the Supreme Court explained what is meant by "clearly established," using, as is the case here, a claimed violation of the due process clause as an example:

The operation of this standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much of the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of vir-

tually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 639–40, 107 S.Ct. at 3038–39. (citations omitted) (emphasis added).

In accordance with the approach articulated by the Supreme Court in *Anderson*, this court, in considering Dr. Rhodes' right to qualified immunity with respect to Dr. Raju's Fourteenth Amendment due process claims, must determine whether Dr. Raju had a constitutionally protected property or liberty interest which was clearly implicated in Dr. Rhodes' actions and whether Dr. Rhodes plainly knew that he was violating any such interests. *See Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1212 (5th Cir.1989). In so doing, this court is bound to decide "exactly what constitutional violation might have occurred if the facts are as ... plaintiff alleged." *Id.* A conclusion by the court that a violation *"arguably"* occurred is not sufficient. *Id.* "Rather, the court must be certain that if

support of the claims asserted in this action are the same issues which were already litigated in regard to the claims asserted by Dr. Raju in the

state proceedings. *See Kremer,* 456 U.S. at 479–80, 102 S.Ct. at 1896–97.

the facts alleged by plaintiff are true, notwithstanding any credibility disputes with defendants, ... then ... a violation has clearly occurred." *Id.*

■■■ To establish a due process claim under the Fourteenth Amendment, Dr. Raju must first demonstrate the deprivation of a constitutionally protected property or liberty interest. *Kinsey v. Salado Indep. School Dist.,* 950 F.2d 988, 997 (5th Cir.1992); *see also Connelly,* 876 F.2d at 1212 ("Due process analysis requires first a finding of a property of liberty interest and then an assessment of what process must attend a particular deprivation."). As noted previously, Dr. Raju alleged violations of his property interests in the directorship of the UMC Transplant Program [11] and the income and profits from his outside medical practice.[12] He has also alleged violations of his liberty interests in the management of his practice, career and income. Consequently, in assessing defendant's right to qualified immunity, the court must determine "whether any of these claims rests upon such clearly established law that the defendant[ ] ha[s] forfeited [his] qualified immunity from suit." *Id.*[13]

Initially, the court finds that because of the collateral estoppel effect of the issues decided by the state court in rendering its judgment on plaintiff's appeal of the Board of Trustees' decision, Dr. Raju is precluded from challenging Dr. Rhodes' defense of qualified immunity. "To have a property interest in a benefit, a person clearly must have more than an abstract need for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). It is undisputed that Dr. Raju has remained on the faculty of the University of Mississippi Medical School as a full professor of surgery and that he has continued to be compensated pursuant to his contract with UMC.[14] It is further undisputed that the

11. As a result of his removal as Director of the Transplant Program, Dr. Raju contends that he has also been deprived of property rights in two positions which were "integral parts" of his position as Director. One was his position as Organ Procurement Director and the other was his position on the Board of Directors of the United Network for Organ Sharing (UNOS). As "integral parts" of his directorship position, the same legal analysis applies to the alleged violations of those property interests as does the alleged violation of Dr. Raju's property interest in his position as Director.

12. Specifically, Dr. Raju has alleged that "Rhodes' actions diverted profits actually generated by him by virtue of the practice plan which Rhodes forced Raju to sign under duress," and that "Rhodes' actions have deprived him of future profits that would be generated by his business."

13. In an attempt to overcome Dr. Rhodes' immunity defense, Dr. Raju, in response to defendant's motion, has presented evidence which he claims shows Dr. Rhodes' alleged bad faith and malice in reorganizing the Transplant Program ·in order to "do Raju in." Subjective malice or bad faith, however, even if present, is irrelevant to the determination of whether Dr. Rhodes is entitled to qualified immunity. *See Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737 ("[A]llegations of malice [will not] suffice to subject government officials either to the costs of trial or to the burden of broad reaching discovery.").

14. The affidavit of Dr. Norman Nelson, Vice Chancellor for Health Affairs at UMC, states that Dr. Raju's employment contract guaranteed him a salary of $78,880. Dr. Raju does not contend that he has not received this salary, but rather, claims that by virtue of the Management Services Agreement which he entered with Dr. Rhodes, Dr. Rhodes has diverted a significant portion of the profits from his private practice *to which he was entitled under his employment* contract with UMC. *See supra* at note 2. Dr. Raju concedes, however, that he not only read the contract, but also made certain changes in its provisions prior to signing. Though he alleges that his signing of the contract was under duress in that Dr. Rhodes had threatened to remove him as Director of the Transplant Program if he did not enter the agreement, the court notes that it is not duress to do what one has the legal right to do. As noted above, it had already been preclusively determined that all of Dr. Rhodes' actions concerning the reorganization of the Transplant Program were within his authority as Chairman of the Department, were not arbitrary and capricious, and were for legitimate administrative and financial concerns. Further, as discussed *infra,* the court is of the opinion that Dr. Rhodes' decision to remove Dr. Raju as Director of the Transplant Program did not violate any of Dr. Raju's clearly established constitutional rights. Consequently, Dr. Raju cannot now complain that the agreement *which he entered* has resulted in a deprivation of his property without due process.

position of Director of the UMC Transplant Program was an uncompensated position and that Dr. Raju received no additional renumeration for serving as Director. Indeed, the state court preclusively determined that Dr. Raju was not demoted by Dr. Rhodes, and that the reorganization of the Transplant Program neither decreased Dr. Raju's duties nor his salary at UMC.

■ The Fifth Circuit has held in a number of cases that unless the state "specifically creates a property interest in a noneconomic benefit such as a work assignment, a property interest in employment generally does not create due process property protection for such benefits." *Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 754 n. 3 (5th Cir.1986) (contract did not "create a property interest in the intangible, noneconomic benefit of [plaintiff's] assignment as coach"). *See also Kinsey v. Salado Indep. School Dist.*, 950 F.2d 988 (5th Cir.1992) ("[Plaintiff] did not have a constitutionally protected interest in the noneconomic benefit of serving as superintendent. Accordingly, we do not reach his contention that he did not receive due process."); *Davis v. Mann*, 882 F.2d 967, 973 n. 16 (5th Cir.1989) ("employee suffers no compensable damage from an early employment termination where he has been paid his full salary for the contract year; no support ... for Davis's claim that he is entitled to the duties and responsibilities of this employment as specified under contract"); *Cannon v. Beckville Indep. School Dist.*, 709 F.2d 9, 11 (5th Cir.1983) (superintendent terminated without hearing did not have due process claim, because he had been paid "the full amount due him under the existing contract"). Application of these precedents to the findings of the state court leads to the conclusion that Dr. Raju had no "clearly established" property interest in his "position" as Director of the UMC Transplant Program or in any income above that which was guaranteed him under his contract with UMC. *See Kinsey*, 950 F.2d at 997. In fact, in the court's view, he did not even have an "arguable"

property interest. *See Connelly*, 876 F.2d at 1212 (to overcome defendant's qualified immunity, property interest must be "clearly established"; existence of "arguable" property interest will not thwart an immunity defense). Accordingly, Dr. Rhodes has qualified immunity as to Dr. Raju's claimed deprivation of property interests without due process.[15]

■ The court likewise concludes that, because of the preclusive effect to be accorded the determinations supporting the state court judgment, Dr. Raju cannot sustain his § 1983 claim against Dr. Rhodes based on the alleged deprivation of constitutionally protected liberty interests. According to Dr. Raju, two variations of a protected liberty interest are submerged in his complaint. He asserts that Dr. Rhodes' actions not only effectively barred him from pursuing his chosen vocation, *see Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir.1983), but also resulted in a stigmatizing injury to his reputation, *see Connelly*, 876 F.2d at 1214–15. With respect to the first assertion, in view of the state court's findings that all of Dr. Rhodes' actions were in the scope of his authority, responsibility and prerogatives as Chairman of the Department of Surgery, were not arbitrary and capricious and were not personal attacks on Dr. Raju, this court cannot conclude that Dr. Rhodes plainly knew that his actions in reorganizing the Transplant Program violated Dr. Raju's right to follow his chosen profession.

■ Dr. Raju is similarly foreclosed from sustaining his reputational due process claim against Dr. Rhodes. It is well established that " 'reputation alone is not a protected liberty interest. A plaintiff must show a stigma *plus* an infringement of some other interest.' In addition, ... the 'plaintiff [must] prove that the stigma was caused by a false communication.' " *Connelly*, 876 F.2d at 1215 (quoting *Vandygriff*, 711 F.2d at 1221). In this regard, the

**15.** Only if the court had concluded that Dr. Raju did have a protected property interest would the court then be called upon to determine whether this interest was so "clearly established" such that Dr. Rhodes must have "plainly known" that he was infringing it. *Connelly*, 876 F.2d at 1214.

Fifth Circuit held in *Moore v. Otero*, 557 F.2d 435 (1977), that

> [w]hen an employee retains his position even after being defamed by a public official, the only claim of stigma he has derives from the injury to his reputation, an interest that *Paul [v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976),] reveals does not rise to the level of a liberty interest. *The internal transfer of an employee, unless it constitutes such a change of status as to be regarded essentially as a loss of employment, does not provide the additional loss of a tangible interest necessary to give rise to a liberty interest meriting protection under the due process clause of the fourteenth amendment. See Sullivan v. Brown*, 544 F.2d 279, 283 (6th Cir.1976) (transfer of teacher did not deprive her of liberty interest); *Danno v. Peterson*, [421 F.Supp. 950, 954 (N.D.Ill. 1976)] (transfer of teacher did not deprive her of liberty interest). *Cf. Colaizzi v. Walker*, 542 F.2d 969, 973–74 (7th Cir.1976) (stigma plus employment discharge gave rise to liberty interest).

*Id.* at 438 (emphasis added).

■ In this case, the circuit court's opinion establishes that Dr. Raju, although removed from the position of Director of the Transplant Program, remains a tenured faculty member of UMC and continues to receive his salary as such. Further, it has been determined by the state court that he was neither demoted nor were his duties or salary decreased as a result of the reorganization of the Transplant Program. Consequently, even assuming that Dr. Raju has been stigmatized, his removal as Director was not "such a change of status to be regarded ... as a loss of employment"

and, therefore, "does not provide the additional loss of a tangible interest necessary to give rise to a liberty interest meriting protection under the due process clause...." *Id. See also Paul*, 424 U.S. at 710, 96 S.Ct. at 1165 ("Certainly there is no suggestion in *Roth* to indicate that a hearing would be required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee."). As Dr. Raju had no "clearly established" liberty interests of which he could have been deprived by Dr. Rhodes' actions, Dr. Rhodes is entitled to qualified immunity as to Dr. Raju's claim based on alleged deprivations of his liberty interests.[16]

■ In addition to his procedural due process claims, Dr. Raju has alleged that as a result of Dr. Rhodes' actions in implementing changes in the Transplant Program, he has been deprived of substantive due process. To maintain a cause of action for violation of substantive due process, a plaintiff must show (1) the existence of a protected property or liberty interest, and (2) arbitrary or capricious deprivation of that interest. *See Honore v. Douglas*, 833 F.2d 565, 568. (5th Cir.1987). Recognizing this, Dr. Raju states in support of his claim that he had "protected property interests in his position as Director of the Transplant Program and to the income generated by his practice," as well as "protected liberty interests in his reputation ... and additionally in his right to engage in 'a common occupation of life.'" According to Dr. Raju, "Rhodes has deprived [him] of all of the above through his arbitrary, capricious and unreasonable actions."

---

16. Even if the court were to find that Dr. Raju could support a claim for deprivation of a protected liberty interest, his due process claim would nevertheless fail as he was provided all the process he was due. Once a plaintiff establishes the deprivation of a liberty interest, he is entitled to nothing more than "'a hearing to clear [his] name.'" *Kelleher v. Flawn*, 761 F.2d 1079, 1087 (5th Cir.1985) (quoting *Wells v. Doland*, 711 F.2d 670, 676 (5th Cir.1983)). In the instant case, it is uncontroverted that Dr. Raju filed a grievance complaint which, in accordance with UMC procedures, was considered in an administrative proceeding before a faculty grievance committee. As noted previously, that committee's decision in regard to Dr. Raju's complaint was reviewed by both the Board of Trustees and the Circuit Court of Hinds County. This court is of the opinion that these proceedings provided Dr. Raju with an opportunity "to clear [his] name." *Id.* As such, Dr. Raju has not been deprived of liberty without due process.

Having concluded that Dr. Raju had no constitutionally protected property or liberty interest, it follows that his substantive due process claim must necessarily fail. Moreover, the state court, in its opinion affirming the findings of the faculty grievance committee and Board of Trustees, concluded that the administrative changes implemented by Dr. Rhodes were not arbitrary and capricious, but rather, were based on legitimate, medical, administrative and financial concerns. The collateral estoppel effect of that state court judgment renders Dr. Raju's substantive due process claim without merit. The court is therefore of the opinion that Dr. Raju cannot establish, in order to overcome Dr. Rhodes' qualified immunity, the violation of a clearly established constitutional right in regard to his substantive due process claim.

C. *Aside from the preclusive effect of the issues previously determined by the state court, is Dr. Rhodes entitled to qualified immunity as to plaintiff's claims under 42 U.S.C. § 1983?*

Although the court is of the opinion that the doctrine of collateral estoppel precludes Dr. Raju from challenging Dr. Rhodes' immunity from suit with respect to the § 1983 claims asserted against him, even were the court to conclude that the doctrine of collateral estoppel does not apply to the state court's findings, the court would nevertheless conclude that the proof submitted by Dr. Raju is not sufficient to overcome defendant's qualified immunity.[17]

17. The court notes at the outset that although it is not to give "slavish deference to a university's arbitrary deprivation of a vested … right," *Honore*, 833 F.2d at 569, federal courts have consistently refrained from interfering in the sort of interfaculty dispute that gives rise to the action presently pending:

In public schools and universities across this nation, interfaculty disputes arise daily over teaching assignments, room assignments, administrative duties, classroom equipment, teacher recognition and a host of other relatively trivial matters. A federal court is simply not the appropriate forum in which to seek redress for such harms. (citations omitted).

1. Has plaintiff been deprived of a constitutionally protected property interest?

 The court is convinced that the undisputed facts of this case dictate a finding that Dr. Raju had no constitutionally protected property interest in the directorship of the UMC Transplant Program. "Property interests in continued employment 'are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law.'" *Soderstrum v. Town of Grand Isle*, 925 F.2d 135, 138 (5th Cir.1991) (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709). In other words, a plaintiff must show an enforceable contractual right, whether explicit or implicit, establishing a legitimate claim of entitlement to continued employment under state law. *See Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). In support of his claim that he held a protected property interest in the directorship position, Dr. Raju has submitted an affidavit in which he states:

In 1980, when I was appointed Director of the Transplant Program at the University of Mississippi Medical Center (UMC) by Dr. James D. Hardy, then Chairman of the Department of Surgery, this was approved by Dr. Norman Nelson, it was implicit in our understanding that my appointment was a permanent one, only to be disturbed when I voluntarily quit or should be terminated for cause. This has been the practice with regard to other persons in similar positions at the

We have neither the competency nor the resources to micromanage the administration of thousands of state educational institutions. (citations omitted). Of all fields that federal courts "'should hesitate to invade and take over, education and faculty appointments at [the university] level are probably the least suited for federal court supervision.'" *Smith v. University of North Carolina*, 632 F.2d 316, 345 n. 26 (4th Cir.1980) (quoting *Faro v. New York University*, 502 F.2d 1229, 1331–32 (2d Cir.1974).

*Dorsett v. Board of Trustees of State Colleges and Universities*, 940 F.2d 121, 123–124 (5th Cir. 1991).

University of Mississippi Medical Center, past and present.

■■ Even assuming the truth of Dr. Raju's assertion, this court is nevertheless bound to conclude that this fact would not establish that Dr. Raju had a protected property interest in his position as Director of the Transplant Program. The court "reiterate[s] the language of *Roth* that understandings and customs must 'stem from ... state law.' [O]nly if consistent with official law may such practices create a property interest...." *Batterton v. Texas Gen. Land Office,* 783 F.2d 1220, 1223–24 (5th Cir.) (citation and footnote omitted), *cert. denied,* 479 U.S. 914, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986). In this regard, Mississippi law makes clear that an agreement for "permanent" employment is terminable at the will of either party for "good reason, a wrong reason, or no reason...." *Kelly v. Mississippi Valley Gas Co.,* 397 So.2d 874, 875 (Miss.1981). *See also Rape v. Mobile & O.R. Co.,* 136 Miss. 38, 100 So. 585 (1924). Furthermore, an oral employment agreement not to be performed within fifteen months is unenforceable under Mississippi law as violative of the statute of frauds. Miss.Code Ann. § 15–3–1(d) (1972). In *White v. Mississippi State Oil and Gas Board,* 650 F.2d 540 (5th Cir. 1981), the Fifth Circuit, applying Mississippi law to an argument similar to that espoused by Dr. Raju, opined:

> White also argues that regardless of whether statutory law provided him with a property interest in his employment, his employment contract provided him a right to continued employment. Though he concedes that no express agreement was made as to the duration of his employment, he contends it was mutually understood that he was hired as a permanent employee. While the district court found that the Board hired White as a temporary employee, the permanent-temporary distinction is not controlling on this point because in Mississippi an agreement for "permanent" employment is terminable at the will of either party. *Sartin v. City of Columbus,* 421 F.Supp. 393 (N.D.Miss.1976), *aff'd without op.,* 573 F.2d 84 (5th Cir.1978); *Kelly v. Mis-*

*sissippi Valley Gas Co.,* 397 So.2d 874 (Miss.1981); *Rape v. Mobile & O.R. Co.,* 136 Miss. 38, 100 So. 585, (1924). While an implied contract can be the source of a protected property interest in employment, it cannot do so in the absence of "mutually explicit understandings that support [the employee's] claim of entitlement." *Perry v. Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699. The district judge found an absence of any such "mutually explicit understandings" and further held that even if the oral contract had attempted to grant White a right to continued employment, it would have been unenforceable under the state's statute of frauds so that White would have been without a legitimate claim of entitlement to continued employment.

> We conclude that White had no protected property interest in his position sufficient to maintain his claim of denial of due process.

*Id.* at 543.

In the case at bar, the court concludes, as did the court in *White,* that under Mississippi law plaintiff had no protected property interest in the directorship position sufficient to sustain his claim of denial of due process. The alleged "mutually explicit understandings" in this case simply do not establish a property interest in that position. It is clear under Mississippi law that Dr. Raju's affidavit in support of his claim that it was mutually understood that his appointment as Director was a "permanent" one, is proof of only an "at-will" relationship and, therefore, is insufficient to establish a property interest in that position.

Nor could any alleged representations or assurances by Dr. Hardy or Dr. Nelson that Dr. Raju's appointment as Director of the Transplant Program was a permanent one create a constitutionally protected property interest. *See Staheli v. University of Mississippi,* 854 F.2d 121, 125 (5th Cir.1988). As the Fifth Circuit has noted:

> [T]he *school itself* must enter into the agreement which gives rise to a protected property interest:

A property right in a government benefit can arise out of an informal or implicit rule or understanding. But there can be no property right unless the government entity in question has adopted the asserted rule or entered into the asserted understanding.

*Id.* (quoting *Sabet v. Eastern Virginia Medical Authority,* 775 F.2d 1266, 1269–70 (4th Cir.1985)). Moreover, even assuming that Dr. Hardy or Dr. Nelson spoke for UMC, "when formal rules and informal understandings conflict, the formal rules control. In other words, when the state provides an explicit and formal policy governing entitlement to a job, informal and customary understandings cannot create a property interest in the face of the formal rules." *Id.*

The court further observes that although Dr. Raju enjoys tenure as a professor at UMC, he has never been granted tenure as Director of the Transplant Program.[18] Dr. Raju does not allege that he was tenured in his position as Director of the Transplant Program. In fact, he contends that the issue of tenure is immaterial to the determination of whether he had a property interest in the directorship position.[19] Instead, according to Dr. Raju, his "legitimate claim of entitlement" to the directorship position is based on custom and practice at UMC that no administrator be removed except for cause, coupled with communications between himself, Dr. Hardy and Dr. Nelson resulting in an understanding that his position as Director was to be a continuing one.

■ The court has already concluded that the alleged "understanding" that Dr. Raju was to be the permanent Director of the transplant Program does not grant him a property interest in that position. Further, while the court accepts Dr. Raju's position that "the fact that [he] is not 'tenured' to his position as Director of the Transplant Program does not preclude the creation and existence of an interest arising out of communications, understandings and custom and practice," the court is nevertheless of the opinion that the existence of the tenure policies in place at UMC is relevant to the court's consideration of whether or not Dr. Raju's claim of entitlement to the directorship position is "legitimate." Ordinarily, when an educational institution has a formal tenure system in place, a faculty member must be tenured in a particular position in order to claim a protectible property interest in that position. *Staheli,* 854 F.2d at 124; *Wood v. University of Southern Mississippi,* 539 F.2d 529, 531–32 (5th Cir.1976). *See also Chiriboga v. Saldana,* 660 F.Supp. 618, 621–22 (D.Puerto Rico 1987) (faculty member did not have property interest in position of director for biomedical and environmental science). Indeed, "the very existence of a tenure system means that those teachers without tenure are *not* assured of continuing employment." *Staheli,* 854 F.2d at 124 (citations omitted). "Of course, if a school has no formal tenure system but has set up in its place explicit or implicit conditions that, if fulfilled, give the teacher job security, the school cannot violate the very agreement that it created and discharge the teacher without constitutional process." *Id. See also Honore v. Douglas,* 833 F.2d 565, 568 (5th Cir.1987).

In this case, as in *Staheli* and *Wood,* the University had a formal, written tenure policy to which it adhered when intending to create job security in a faculty member's particular position. This tenure policy makes clear that an administrative position such as Director of the Transplant Program is an untenured position. It is therefore apparent that UMC did not intend to

---

18. According to the bylaws and policies of the Board of Trustees, which govern tenure at UMC, all tenure appointments must be in writing and be in the possession of both the institution and teacher before the appointment is consummated.

19. Plaintiff points out, and the court agrees, that under the tenure policy of the Board of Trust-

ees, no administrator at UMC is tenured in relation to any particular position. The affidavit of Ann Homer Cook, the Board of Trustees' Associate Commissioner/Executive Secretary, states specifically that "[a]ccording to board policy, an individual is *not* tenured to a title, but rather to a department at a particular institution."

grant faculty members entitlement to administrative positions to which they were appointed. Otherwise, the tenure policy in place at UMC would have provided for the granting of tenure with respect to such positions.

■■ Absent either an enforceable contractual right under state law not to be removed except for cause or a formal grant of tenure in the position at issue, both of which are lacking in this case, any expectation by Dr. Raju that his position as Director of the Transplant Program was to be permanent could hardly be characterized as "legitimate." *See Englestad v. Virginia Municipal Hosp.*, 718 F.2d 262, 265–66 (8th Cir.1983) (no property interest in oral agreement to serve as director of pathology). The court thus concludes that Dr. Raju's claim of entitlement to the directorship position based upon a mutually explicit understanding is insufficient to create a protectible property interest under the due process clause.

In sum, the court is of the opinion that Dr. Raju has identified no factual basis or legal authority to support his claim that he had a property interest in remaining Director of the Transplant Program or maintaining a certain level of income from his outside practice.[20] Under these circumstances, the court cannot reasonably conclude that plaintiff possessed a "clearly established" property interest which defendant could have plainly known he was infringing by not providing Dr. Raju with a hearing prior to reorganizing the Transplant Program or removing him from the position of Director. *See Connelly*, 876 F.2d at 1214. Therefore, Dr. Raju has not sustained his burden of establishing that Dr. Rhodes has forfeited his qualified immunity from suit as to Dr. Raju's property interest claim.

### 2. Has plaintiff been deprived of a constitutionally protected liberty interest?

Although "liberty" protects one's "general right to pursue an occupation unhindered by arbitrary government action," it is apparent to the court that neither Dr. Rhodes' reorganization of the Transplant Program nor his implementation of the Management Services Agreement "entirely disabl[ed] [Dr. Raju] from pursuing [a career as transplant surgeon]." *Id.* Dr. Rhodes "did not invoke any regulations to bar [Dr. Raju] from all other public employment...." *Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707. Absent a regulatory or licensing bar to plaintiff's performing as a transplant surgeon in either the private or public sector, this court must conclude, as did the Supreme Court in *Roth*, and the Fifth Circuit in *Connelly*, that plaintiff's asserted liberty interest in the right to pursue his chosen vocation has not been implicated in this case. *See Roth*, 408 U.S. at 573–74, 92 S.Ct. at 2707 (respondent denied relief because "[t]he State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case."); *Connelly*, 876 F.2d at 1214 (governmental officer's evaluation of plaintiff's qualifications "did not amount to 'licensing'" and, therefore, plaintiff's liberty interest in pursuing chosen occupation not violated).

In support of his injury to reputation claim, plaintiff has submitted certain letters written by Dr. Rhodes which, according to plaintiff, "impugn, on foundless charges, Plaintiff's integrity on matters of grave concern in the medical community." Additionally, Dr. Raju's affidavit states that Dr. Rhodes orally communicated with others in regard to these matters. Accord-

**20.** Although Dr. Raju maintains that Dr. Rhodes' actions in removing him as Director and restricting the use of intensive care unit beds for transplant patients has "caused a drastic decline in the profits that [he] ha[s] been able to generate," he has cited no provision in his contract with UMC entitling him to a certain number of available beds, a certain number or type of transplants, or any specific amount of profits. As discussed previously, his contract provides only that he is to receive a set salary as a tenured professor and 50% of the profits above $120,000 from his private practice. There simply is no guarantee that he is to be afforded the most advantageous environment possible for his generating outside income, much less at the expense of all other administrative and financial concerns.

ing to Dr. Raju, these alleged communications "were of an exceedingly damaging and disparaging nature and caused Raju very palpable harm in the medical community." Assuming, for purposes of this motion, that these letters and alleged oral statements by Dr. Rhodes stigmatized Dr. Raju, his reputational due process claim nevertheless fails since plaintiff has not established the " 'infringement of some other interest' " necessary for such stigmatizing communications to be constitutionally actionable. *Connelly,* 876 F.2d at 1215 (quoting *Vandygriff,* 711 F.2d at 1221). The court finds that neither Dr. Raju's alleged lost income nor his losing the Transplant Program directorship are "sufficient additional deprivation[s] to come within the rule on reputation injury," *id.,* since neither the directorship nor any income above that guaranteed to Dr. Raju under contract are "rights ... previously recognized by state law." *Paul,* 424 U.S. at 711, 96 S.Ct. at 1165. *See also Wells v. Hico Indep. School Dist.,* 736 F.2d 243, 256 (5th Cir.1984) ("[R]eputation alone [is not] a constitutionally protected interest.... Rather, the stigma must be imposed by the state in connection with its denial of a right or status previously recognized by state law....").

D. *Is Dr. Rhodes entitled to public official immunity as to plaintiff's state law claims?* [21]

■ Dr. Raju has alleged that, under duress, he entered a practice plan with Dr. Rhodes, and that subsequent to his signing of this agreement, Dr. Rhodes breached his duty of good faith and fair dealing under the contract by wholly undermining Dr. Raju's ability to generate revenue.[22] Specifically, Dr. Raju contends that Dr. Rhodes substantially interfered with his ability to generate funds and generally carry on his business by "remov[ing] [him] as director of the transplantation program, plac[ing] new restrictions on the use of ICU beds by transplantation patients, and put a moratorium on all transplant surgeries except kidney transplants."

■ Under Mississippi law, governmental officials of the state are immune "to a civil action for damages when acting in the performance of official functions discretionary in nature. They lose that immunity only when they substantially exceed their authority and commit wrongs under color of office. They have no immunity where they commit willful wrongs or malicious acts." *Hudson v. Rausa,* 462 So.2d 689, 696 (Miss.1984) (citations omitted). In *Grantham v. Department of Corrections,* 522 So.2d 219 (Miss.1988), the Mississippi Supreme Court specified the various exceptions that remove a public official from immunity protection:

> [A] governmental official has no immunity to a civil action for damages if his breach of a legal duty causes injury and (1) that duty is ministerial in nature, or (2) that duty involves the use of discretion and the governmental actor greatly or substantially exceeds his authority and in the course thereof causes harm, or (3) the governmental actor commits an intentional tort. Beyond that, a governmental official has no immunity when

**21.** Dr. Raju argues that this court, under the law of the case doctrine, *see Barrett v. Thomas,* 809 F.2d 1151, 1155 (5th Cir.1987), should dismiss the defendant's motion with regard to the state common law claim of immunity since, according to plaintiff, the issue of Dr. Rhodes' public official immunity was rejected in the state court system prior to removal to this court. The court, however, finds this argument unpersuasive in that the merits of Dr. Rhodes' immunity defense have never been ruled on. Prior to removal, the Circuit Court of Hinds County held only that plaintiff could conduct limited discovery on the sole issue of defendant's immunity. In fact, the order entered by that court stated specifically that defendant "[was] not precluded from filing a motion for summary judgment at a later date on the qualified immunity issue." The only other action taken on this issue in the state court system was the Mississippi Supreme Court's refusal to grant an interlocutory appeal from the order of the circuit court. Again, however, the actual merits of Dr. Rhodes' entitlement to immunity were not addressed in the court's denial of defendant's petition.

**22.** Plaintiff has also included a state law tortious interference with business relations claim based upon the same actions which he claims give rise to his breach of contract claim.

sued upon a tort that has nothing to do with his official position or decision making function and has been committed outside the course and scope of his office.

*Id.* at 225.[23]

In the case *sub judice*, it has been preclusively determined by the Circuit Court of Hinds County that the above described actions of defendant, which give rise to plaintiff's claim that Dr. Rhodes breached his duty of good faith and fair dealing under the contract at issue, were within the scope of his authority, responsibility and prerogatives as Chairman of the Department of Surgery, were not arbitrary and capricious, and were not personal attacks on Dr. Raju. Based upon Mississippi law, as set forth above, the court therefore finds that Dr. Rhodes is immune from suit as to Dr. Raju's state law breach of contract claim.[24] For the same reasons, Dr. Rhodes is also immune from suit with respect to the claim for tortious interference with business relations.

## CONCLUSION

Based on the foregoing, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.

---

23. With regard to the administration of state medical institutions, the Mississippi Supreme Court has continually adhered to its position that medical decisions are discretionary in nature. *See, e.g., Hudson,* 462 So.2d at 695–96. As explained in *Marshall v. Chawla,* 520 So.2d 1374 (Miss.1988):

> The [plaintiffs] responded that while the formation of the overall health policy against tuberculosis might have been "discretionary," particular actions in carrying it out, such as treatment of specific individuals, were ministerial. The court rejected this narrow view, saying "we believed the discretion given to the defendants applied not only to their decisions with instituting a program for control, but also the treatment administered in carrying out such policies." The court came very close to saying that "all" medical decisions would be immunized from suit if they occurred in the context of a state institution because "the administration of medical treatment involves the exercise of considerable professional judgment and its discretion...."

*Id.* at 1375–76 (citing *Hudson,* 462 So.2d at 695–96).

24. Dr. Raju argues that by presenting evidence of malice on the part of Dr. Rhodes he has overcome Dr. Rhodes' public official immunity. *See McFadden v. State,* 542 So.2d 871, 883 (Miss. 1989) (quoting *Hudson,* 462 So.2d at 696) (plaintiff " 'must show something which would suggest malice, wilful wrongs or acts by these defendants substantially outside their official authority' "). Because of the preclusive effect of the state court's findings, Dr. Raju is foreclosed from establishing either that Dr. Rhodes' actions were malicious or that they were "substantially outside [his] official authority." *Id.* Indeed, it cannot be deemed an intentional or wilful wrong to do what one has the legal right or authority to do. As both the Circuit Court of Hinds County and this court have concluded, Dr. Rhodes had the right to reorganize the Transplant Program and to remove Dr. Raju as its Director. He likewise had the right to enter into the Management Services Agreement with Dr. Raju, just as Dr. Raju had the right to refuse to enter into the agreement and unilaterally terminate it as he later did. Under Mississippi law, Dr. Raju has not overcome Dr. Rhodes' public official immunity.