David A. CONNELLY,
Plaintiff–Appellee,

v.

COMPTROLLER OF THE CURRENCY,
et al., Defendants–Appellants.

No. 87–6187.

United States Court of Appeals,
Fifth Circuit.

July 7, 1989.

---

Robert D. Kamenshine, Peter D. Maier, John F. Cordes, U.S. Dept. of Justice, Washington, D.C., and Hays Jenkins, Jr., Asst. U.S. Atty., Houston, Tex., for defendants-appellants.

Joan M. Lucci Bain, Stuart M. Nelkin, and Nelkin & Nelkin, Houston, Tex., for plaintiff-appellee.

Before GARZA, JOLLY and JONES, Circuit Judges:

EDITH H. JONES, Circuit Judge:

At issue is the qualified immunity of officials who work for the Comptroller of the Currency and who opined that Connelly was unqualified to be president of a proposed national bank. The district court denied summary judgment on the officials' defense of qualified immunity, and they filed this interlocutory appeal. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We reverse, concluding that the Privacy Act does not create individual liability and that the alleged vio-

lations of the Fifth Amendment and Administrative Procedure Act were not sufficiently clear to subject the Comptroller's officials to individual liability.

## BACKGROUND

The relevant facts described by the district court are largely undisputed.[1] *Connelly v. Comptroller of the Currency,* 673 F.Supp. 1419, 1422–23 (S.D.Tex.1987). In the fall of 1983, Connelly signed a contract to become the president of a proposed national bank, Westwood National Bank in Houston. The bank's organizers submitted his name to the Comptroller of the Currency ("Comptroller") for approval with the rest of their application. The application included a resume and list of references, "Confidential Biographical and Financial Report," signed by Connelly.[2]

Defendant Arthur Oliver, a national bank examiner in Dallas, instructed Marcia Oley to investigate Connelly's past performance, for seven years, as president of two related banks in Texas. A review of one bank's loan records revealed that Connelly had initiated a number of "weak" loans that were on the bank's "watch list." In response to a request for more information, the president of the parent bank, Fred McMahen, telephoned Oley's supervisor, Mr. Golden. McMahen expressed dissatisfaction with Connelly's administrative abilities and did not recommend Connelly for a chief executive officer position. These facts were communicated to Oliver.

Oliver then interviewed Connelly. Connelly acknowledged that there had been problems with some loans and tried to explain them. Connelly was not, however, told that his nomination might be jeopardized because of his loan performance or McMahen's unfavorable evaluation. On the basis of the interview and Oley's memo-

---

1. Although the district court believed that there were material facts in dispute, the narrative is undisputed. What the district court and Connelly assert are factual disputes are really disputes about whether the law is clearly established.

2. The Comptroller is responsible for reviewing the management of proposed national banks. *See* National Banking Act, 12 U.S.C. §§ 21–27; Federal Deposit Insurance Act, 12 U.S.C. § 1811–16. Section 1816 requires the Comptroller to consider "the general character of [proposed bank] management" before he may issue a banking certificate.

randum, Oliver drafted a letter for the signature of defendant John Bodnar, District Administrator of the Comptroller of the Currency. Bodnar signed the letter informing the organizers of Westwood Bank that their charter would not be approved with Connelly as president. The letter stated: "We are of the opinion that Mr. Connelly does not possess the qualifications required for the position of President of Westwood National Bank ..." The bank organizers then cancelled their agreement for Connelly to become president of the bank.

Connelly filed this suit against the Comptroller, Bodnar and Oliver in their official and individual capacities. He alleges that the determination that he was unqualified (1) violated the Privacy Act, 5 U.S.C. § 552a(g)(1), (2) deprived him of property and liberty interests without adequate procedural safeguards under the Fifth Amendment due process clause, and (3) violated the Administrative Procedure Act's protection against arbitrary agency actions, 5 U.S.C. §§ 706(2)(A), (D).[3] The defendants moved to dismiss the complaint for failure to state a claim. Treating the motion as one for summary judgment after some limited discovery, the district court denied the motion on all three of Connelly's claims. The court also rejected the officials' motion seeking immunity from personal liability. We review only this last determination on interlocutory appeal.[4]

## I. ANALYZING AN IMMUNITY DEFENSE

The defendants' right to qualified immunity is to be assessed according to the approach articulated by the Supreme Court in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court held that qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* 107 S.Ct. at 3038. Thus, for a plaintiff to prevail, the rights that are claimed to have been violated must be " 'clearly established' at the time [the action] was taken." *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)). In *Anderson*, 107 S.Ct. at 3038–39, the Court explained what is meant by "clearly established," using a claimed violation of the due process clause as an example:

The operation of the standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that*

**3.** The Administrative Procedure Act (APA) claim bootstraps the Privacy Act and Fifth Amendment claim, asserting that the agency action was not in accordance with those laws. Since Connelly does not allege a violation of any other statutes or regulations, his APA claim must fail if his Privacy Act and Fifth Amendment claims fail.

**4.** Because we resolve the case on the basis of the defendants' qualified immunity defense, we do not address their claim that their determination was sufficiently adjudicative to invoke absolute "quasi-judicial" immunity under *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

*what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent. (citations omitted) (emphasis added).

Accordingly, as to Connelly's constitutional claims, we must determine whether his clearly established constitutional property right or liberty interest was implicated in the Comptroller's actions and whether the Comptroller's officials plainly knew they were violating those interests.

 The district court denied summary judgment on Connelly's claims against the appellants in both their individual and official capacities by concluding that Connelly "arguably" had a constitutionally protected property interest in his contract with Westwood's organizers, 673 F.Supp. at 1425, and that there was a genuine, material factual issue whether his professional reputation was damaged. *Id.* Specifically, with respect to the immunity defense, the court seems to have assumed that the existence of an "arguable" right to property or liberty triggered due process protections, for its analysis deals only with the inadequacy of the "hearing" afforded Connelly. Due process analysis requires first a finding of a property or liberty interest and then an assessment of what process must attend a particular deprivation. We must disagree with the court's implicit assumption that the existence of an "arguable" property or liberty interest may thwart an immunity defense.

It is a common failing in qualified immunity decisions that courts avoid deciding exactly what constitutional violation might have occurred if the facts are as a plaintiff alleged. We have previously required a plaintiff to allege the facts underlying his claimed violation of constitutional rights with sufficient specificity to demonstrate that defendants' qualified immunity should be revoked. *See Geter v. Fortenberry,* 849 F.2d 1550 (5th Cir.1988); *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985). Based on those alleged facts, or facts that may de-velop after discovery pertaining to qualified immunity, *see Lion Boulos v. Wilson,* 834 F.2d 504 (5th Cir.1987); *Geter,* 849 F.2d at 1554, the court must be able to characterize the plaintiff's claim precisely as a matter of constitutional law before ruling upon an immunity defense. It is not enough that the court concludes that a violation *arguably* occurred. Rather, the court must be certain that if the facts alleged by plaintiff are true, notwithstanding any credibility disputes with defendants, *then* a violation has clearly occurred. The purpose of requiring careful characterization of plaintiff's claim at the outset of a qualified immunity analysis is to effectuate the goal of that defense, which is immunity from suit, not just from trial. *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2815.

Stating that a plaintiff's claims must be precisely characterized does not necessarily make the task easy, because of the nuances that have developed in various areas of constitutional law. *See e.g., Noyola v. Texas Dept. of Human Resources,* 846 F.2d 1021 (5th Cir.1988). This case exemplifies the nuances that permeate the due process clauses. *Mangaroo v. Nelson,* 864 F.2d 1202 (5th Cir.1989) (qualified immunity upheld against claim of procedural due process violation). Connelly alleged violations of his "property" interest in the presidency of the proposed Westwood National Bank; a "liberty" interest in his reputation and his ability to pursue a position as a chief bank executive; and freedom from disclosure of his rejection under the Privacy Act. We must address in turn whether any of these claims rests upon such clearly established law that the defendants have forfeited their qualified immunity from suit. A conclusion that the facts alleged by Connelly could not establish a violation of law or constitutional right will also require judgment in the defendants' favor.

## II. PROPERTY INTEREST

 It is a simple matter from the standpoint of the immunity defense to say that, based on long-established caselaw, a tenured government employee was denied due process if he was fired without any kind of

hearing. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is another matter entirely when, as here, the property right is a contract in a proposed national bank whose existence is contingent upon regulatory approval. Connelly had a contract, to be sure, but neither the venture nor Connelly had an unqualified right to the fulfillment of that contract by the granting of a national bank charter. The Comptroller of the Currency possesses broad powers to assess each applicant for a national bank in terms of statutory criteria including "[t]he financial history and condition of the bank, the adequacy of its capital structure, its future earnings prospects, *the general character of its management,* the convenience and needs of the community to be served by the bank, and whether or not its corporate powers are consistent with the purposes of this chapter." 12 U.S.C. § 1816 (emphasis added). See also 12 U.S.C. §§ 1814–15. Denial of a charter may hinge on virtually subjective, albeit professionally informed, judgments. It seems unlikely that Connelly should be able to contest as a breach of his property interest an unfavorable decision by the Comptroller which resulted from factors such as the applicant bank's capital structure or the needs of the community. The denial here, however, depended upon the Comptroller's evaluation of Connelly, and so directly threatened his executory contract with Westwood.[5] To try to describe Connelly's property interest is almost to refute the possibility that it was so clearly established as to abrogate the defendants' qualified immunity.

Undeterred by the lack of authority in any comparable regulatory setting at the time he filed suit, Connelly has analogized his claimed constitutional property right to several cases. On examination, none of them clearly establishes his property right. In *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570

(1972), the Court held that a property interest was created by "a written contract with an explicit tenure provision" between the plaintiff and the government officials. *Id.* There was no "formal understanding" between Connelly and the government in this case.[6] The two cases cited favorably to Connelly by the district court are also distinguishable. In *Phillips v. Bureau of Prisons,* 591 F.2d 966, 971 (D.C.Cir.1979), the D.C. Circuit held that Bureau rules granting liberal access to prisoners created a legitimate claim of entitlement for a paralegal who was denied access to federal prisons to work with prisoners on their cases. It does not follow that bank regulations which require the Comptroller to scrutinize the qualifications of prospective bank managers creates a similar entitlement. That would essentially constitute an entitlement to approval of prospective bank managers' qualifications. *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959), dealt with a person's property and liberty interest in a "licensing" decision. The Supreme Court assumed that the revocation of a security clearance effectively disqualified the aeronautical engineer from future work in his entire field and therefore entitled him to a predeprivation hearing. *Id.*

Likewise, *Phillips v. Vandygriff,* 711 F.2d 1217, 1221–27 (5th Cir.1983), *clarified on rehearing,* 724 F.2d 490, *cert. denied,* 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984), may be taken as a licensing case. Phillips alleged that he could not find a managerial position in any savings and loan because of Vandygriff's repeated slander against him to each savings and loan to which he applied. *Id.* at 1220 and 1220 n. 1. This Court found that the *de facto* licensing by the Commissioner of the Texas Savings and Loan Department effectively disqualified plaintiff from *any* employment

---

**5.** Although the unsuccessful bank applicant may secure a hearing after the Comptroller's denial of a charter, it is not clear that a prospective bank president could do so alone. 12 C.F.R. § 5.13 (1984).

**6.** The defendants distinguish *Federal Deposit Insurance Corp. v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) as a case involving the FDIC's suspension of someone who was then serving as president of a chartered bank. Connelly never challenges this distinction.

as a bank manager. *Id.* at 1220, 1222.[7] Connelly has accepted an executive banking position since the Westwood Bank application was rejected, hence, he cannot argue that the defendants' actions amounted to a *de facto* revocation of a license to work as a bank manager.[8]

To the extent Connelly could be viewed as an applicant for the Westwood Bank presidency before the Comptroller, caselaw cuts against his property interest claim. In *Huffstutler v. Bergland,* 607 F.2d 1090, 1092 (5th Cir.1979), this court held that a probationary government employee had no property interest in his job, and that he may be discharged for any legitimate (constitutional) reason. *See also White v. Office of Personnel Management,* 787 F.2d 660, 663 (D.C.Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 276, 93 L.Ed.2d 252 (1986) (rather than exclude White from all government employment, "the government merely found that a particular application for a particular job was unsuccessful").

We do not here hold that Connelly has no constitutional claim for deprivation of a property interest without due process of law. Indeed, the Eighth Circuit recently found that a due process claim was sufficiently alleged by the would-be president of a meat packing company who was fired from that position because the FDA, without holding a hearing, declared him professionally unfit to justify commencing FDA meat inspections. *Chernin v. Lyng,* 874 F.2d 501 (8th Cir.1989) (Secretary of Agriculture cannot arbitrarily interfere with president's continuing, at-will employment with meat packer). Chernin, however, did not assert personal liability of the government officials. Connelly had no "clearly established" property interest in the West-

wood National Bank presidency. Because his property right is at best "arguable," as the district court conceded, the defendants cannot have plainly known that they were infringing it.

## III. LIBERTY INTEREST

■ Two variations of a ˈprotected liberty interest are submerged in Connelly's complaint. He asserts that the Comptroller's action effectively barred him from pursuing work in his chosen vocation as a bank president. *Phillips v. Vandygriff,* 711 F.2d at 1222 ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure.") (*citing Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915)). He also alleges a stigmatizing injury to his professional reputation. On analysis, neither of these claims rests on clearly-established constitutional law.

Even if *Greene v. McElroy, supra* and *Vandygriff* establish a general right to pursue an occupation unhindered by arbitrary government action, these cases do not readily translate into a principle available for Connelly. Without deciding the issue, we simply note that the Comptroller's evaluation of Connelly's qualifications did not entirely disable him from pursuing banking or related financial careers. The Comptroller's decision did not amount to "licensing" in this extreme sense.

Connelly's reputational due process claim is, however, not even arguable. In *Vandygriff,* 711 F.2d at 1221, we noted that *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47

---

**7.** Even if *Phillips* established a procedural due process right in any applicant for a managerial position who had to be approved by a government agency, it would be a close question whether that right was "clearly established" when the Comptroller reviewed Westwood's proposal in 1983. *Phillips* was decided August 15, 1983.

**8.** Connelly also relies on *Cowan v. Corley,* 814 F.2d 223 (5th Cir.1987), but that case is inapposite. The Court reversed a 12(b)(6) dismissal where the plaintiff "had been denied the oppor-

tunity to pursue his livelihood." *Id.* at 227. The plaintiff alleged that a county sheriff terminated his membership in a wreckers' association whose members alone were entitled to tow vehicles from the public streets. The court remanded the case, but concluded that, "the right to engage in the occupation of one's preference is not absolute." *Id.* at 230. Qualified immunity was not at issue, but the Court's opinion demonstrates that even Cowan's asserted right to tow vehicles from the streets was not clearly established.

L.Ed.2d 405 (1976), "made clear the idea that reputation alone is not a protected liberty interest—a plaintiff must show a stigma *plus* an infringement of some other interest." In addition, this Court read *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), as requiring the "plaintiff [to] prove that the stigma was caused by a *false* communication." *Id.*

Even if Connelly's losing the Westwood Bank presidency is a sufficient additional deprivation to come within the rule on reputation injury there has been no false stigmatizing communication of the type that is constitutionally actionable. This Court has found sufficient "stigma" only in concrete assertions of wrongdoing by an agency, not in its mere rejection of a job applicant. *Compare Huffstutler,* 607 F.2d at 1092 (rather than "accuse Huffstutler of property theft," the agency merely rated his honesty as "unsatisfactory") and *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 340 (5th Cir.1978) (mere nonrenewal of a teaching contract) *with White v. Thomas,* 660 F.2d 680, 684 (5th Cir.1981) (public accusation of lying on a job application) and *Robinson v. Wichita Falls & N. Texas Com. Action Corp.,* 507 F.2d 245 (5th Cir.1975) (public accusation of falsifying travel vouchers). The letter to the Westwood charter applicants said that: "We are of the opinion that Mr. Connelly does not possess the qualifications for the position of President of Westwood National Bank ..." The opinion of the Comptroller contains no false factual representations, concrete or otherwise.[9]

## IV. THE PROCESS THAT WAS DUE

Because we have determined that no clearly established property or liberty interest was at stake in the Comptroller's evaluation of Connelly's qualifications to serve as a bank president, the applicants are entitled to qualified immunity. We need not go further and speculate what process was due, and whether it was fulfilled, in the rather shoddy investigation performed by

the defendants. This inquiry is preserved for the trial court when it considers Connelly's action against the defendants in their official capacity.

## V. PRIVACY ACT CLAIM

■ We reverse the district court's denial of qualified immunity on Connelly's Privacy Act claim because individuals are not liable for damages under the Act. A plaintiff may only file civil actions against "the agency" for which "the United States" is liable. 5 U.S.C. § 552a(g). *See Brown–Bey v. United States,* 720 F.2d 467, 469 (7th Cir.1983) (dismissal of claim proper since the "Privacy Act authorizes private civil actions for violations of its provisions only against an agency, not against any individual"); *Windsor v. The Tennessean,* 719 F.2d 155, 160 (6th Cir.1983) (same); *Wren v. Harris,* 675 F.2d 1144, 1148 n. 8 (10th Cir.1982); *Bruce v. United States,* 621 F.2d 914, 916 n. 2 (8th Cir.1980). Consequently, because Congress has created no cause of action against individual government officials for violating the Privacy Act, these defendants are exposed to no liability for which they might assert an immunity defense. *See Noyola v. Texas Dept. of Human Resources,* 846 F.2d 1021, 1024 (5th Cir.1988) (where defendants did not violate clearly established first amendment law, summary judgment should have been granted on immunity defense).

For the foregoing reasons, we REVERSE the judgment of the district court with respect to the defendants' qualified immunity defense.

GARZA, Circuit Judge, dissenting.

I must respectfully dissent from the analysis and the holding of the court. It is my opinion that one's right to pursue a chosen career was and still is a clearly established liberty interest entitled to protection from arbitrary or unreasonable government interference; in this regard I feel the majority's opinion is incorrect. I do not take issue here with the majority's

---

9. Thus, we do not reach the issue whether the expression of their opinion is protected by the First Amendment.

reasoning on the issues of whether Connelly's contract gave him a property right or whether he suffered a stigma or reputational injury.

The pivotal case, which the majority opinion fails to adequately distinguish, is *Phillips v. Vandygriff*, 711 F.2d 1217 (5th Cir. 1983). In that case Phillips interviewed with agents of a savings and loan with an eye towards a position as a managing officer. He never received this position due to severe irregularities in the affairs of the savings and loan, which ultimately resulted in the indictment of two of its officers. Phillips, who was at no time an employee of the savings and loan, attempted to find other similar employment. These attempts were unsuccessful because of a custom in the industry of screening prospective managerial employees with Vandygriff, Commissioner of the Texas Savings and Loan Department. Vandygriff allegedly suspected Phillips of some kind of wrongdoing, and withheld his recommendation of Phillips for employment, which had the effect of excluding him from the industry.

Phillips filed a complaint against the Texas Savings and Loan Department, Vandygriff, and several other defendants alleging, among other claims, an infringement of his constitutional rights in violation of 42 U.S.C. § 1983. With respect to Phillips' § 1983 claim, the jury returned a verdict in his favor, which the trial court overturned on judgment notwithstanding the verdict. The basis for the JNOV was that the judge had reconsidered an earlier ruling and had become convinced that Phillips' claim for violation of a liberty interest required that he prove the falsity of Vandygriff's statements. Since there was no real contention that Vandygriff's refusal to recommend Phillips constituted a false statement, judgment in favor of Vandygriff on this issue was proper as a matter of law in the eyes of the trial court.

On appeal, the Fifth Circuit reversed this holding and granted a new trial on this issue. Central to its reasoning was that Phillips' constitutionally protected liberty interest had two distinct prongs. One prong was the traditional "stigma-plus"

§ 1983 claim, which requires the plaintiff to prove that she suffered a stigma or reputational damage which was caused by a false communication. The other completely different theory of liberty infringement, which formed the basis for the order of a new trial, was termed by the court a *"de facto* licensing." *Vandygriff,* 711 F.2d at 1223. The court used this term to refer to the fact that Vandygriff, while not in an official position to deny Phillips or anyone else a managerial position, nonetheless had such political sway that his withholding of a recommendation had the effect of an outright denial.

The court next concluded that such a blanket denial had the effect of excluding Phillips from the savings and loan industry as a manager. This violated Phillips liberty interest, not on the basis of an asserted stigma, but separately by infringing upon Phillips constitutional right to pursue the occupation of his choice. Under this theory Phillips did not have to prove that Vandygriff's communications were false, but rather that Vandygriff's (a state agent) actions unreasonably or arbitrarily excluded him from his chosen profession. *Id.* at 1224.

In tracing the historical development of the right to engage in one's chosen occupation, the court noted that " '[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure.' " *Id.* at 1222 (quoting *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915)). "This Circuit has also repeatedly acknowledged the principle that a person has a liberty interest in pursuing an occupation." *Id.* (citing *Ferrell v. Dallas Independent School District,* 392 F.2d 697, 707 (5th Cir.1968); *Shaw v. Hospital Authority,* 507 F.2d 625, 628 (5th Cir.1975); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir.1982)). The court concluded its analysis of this theory of liability by noting that "[u]nder these Supreme Court and Fifth Circuit cases, *it is clear* that Phillips' interest in that occupation is a liberty interest within the ambit of

the fourteenth amendment. *Id.* (emphasis supplied).

In the face of this vivid and completely unambiguous statement of the prior law, the majority would assert that, if Connelly did have a protectable liberty interest in his chosen occupation as a bank president, it was not clearly established. I find this conclusion untenable. Rather than plod through a lengthy recitation of the abundant and perhaps overwhelming precedent from the Supreme Court and Fifth Circuit which clearly holds that there is a protectable liberty interest in the freedom to pursue one's chosen occupation (even if one is a bank manager, as the Vandygriff case illustrates), I will content myself with a brief citation to the more illustrious cases, leaving their perusal to my more interested and/or skeptical readers. *See Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) (unreasonable denial of a security clearance to a defense contractor denied him the right to hold specific private employment and thus interfered with liberty and property interests protected by the Fifth Amendment); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (state cannot exclude a person from the practice of law in contravention of the Due Process clause of the Fourteenth Amendment); *Myer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 ("Without doubt, [liberty in the fourteenth amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life...."); *Sosa v. Board of Managers of Val Verde Memorial Hospital,* 437 F.2d 173 (5th Cir. 1971) (exclusion of a physician from hospital staff privileges also falls within the right to due process).

The majority tries to distinguish *Vandygriff* on two bases. First, they point out that the case "may be taken as a licensing case. Phillips alleged that he could not find a managerial position in any savings and loan because of Vandygriff's repeated slander against him to each savings and loan to which he applied." First, the "slander" aspect of the case is irrelevant, since the central holding of *Vandygriff* was that one needs to show falsity only under a stigma-plus theory of liberty infringement, but not under an interference with occupation theory. Under this latter theory, it is sufficient to show that the state unreasonably or arbitrarily interfered with a person's right to pursue a chosen occupation. The case is also more than just a licensing case, although I am not sure exactly what distinction the majority is trying establish with that characterization. Certainly, *Vandygriff* involved licensing elements, but so does this case. In fact, the case at hand presents an even clearer case of government interference than did the *Vandygriff* case. In *Vandygriff,* the alleged state interference was as a result of the desire on the part of savings and loan officers to curry favor with Vandygriff, whose official duties did not actually allow him to pass on the merits of candidates for positions. The court termed this situation "de facto licensing," which basically meant that Vandygriff had the influence to exclude persons from positions in banks, although this power did not derive directly from his official duties but rather from his position of power and discretion. However, in this case, the Comptroller's Office is specifically authorized to investigate the qualifications of proposed officers, and reject an application for charter if they are deemed unqualified. In effect, they have direct licensing authority. Although, technically, the Comptroller's Office cannot veto an individual, but rather must deny or approve the application for charter as a whole, it is patently ridiculous to expect Westwood or any other bank to blindly submit Connelly's name as president when they knew the Comptroller's Office considered him unqualified and would therefore reject the application on that basis. Moreover, a charter applicant is usually anxious to avoid even the hint of controversy that may spark a more stringent examination of the charter application, and thus will take great pains to avoid associating itself with controversial persons such as Connelly (just as the savings and loan officers in Vandygriff were anxious to please Mr. Vandygriff and thus

avoided associating themselves with Phillips).

The second distinction between this case and Vandygriff urged by the majority is that Connelly has not been deprived of a position as a bank manager or officer, but only as a bank president. "Connelly has accepted an executive banking position since the Westwood Bank application was rejected, hence, he cannot argue that the defendants' actions amounted to a de facto revocation of a license to work as a bank manager.... Without deciding the issue, we simply note that the Comptroller's evaluation of Connelly's qualifications did not entirely disable him from prusuing banking or related financial careers." Connelly is presently employed as a bank vice-president. Initially, I question the majority's assumption that these positions are similar: my own opinion is that they are worlds apart in terms of prestige, responsibility, and compensation. But my opinion of the degrees of distinction within the banking world, as well as the opinion obviously held by the majority, must yield to the standard of review that we are bound to employ in cases such as this. In ruling on a motion for summary judgment, we are bound to give the non-moving party, Connelly, the benefit of every reasonable inference from the evidence and pleadings. Connelly has alleged in his complaint and submitted affidavits to the effect that the Houston banking community is closely knit, and it is widely known that the reason the charter for Westwood National Bank was rejected is because Connelly was nominated. This rejection occurred as the direct result of a shoddy and improper investigation of Connelly's qualifications by Comptroller's Office investigators. Mr. Lawrence Fraser submitted an affidavit stating that Connelly's "ability to secure employment in the banking industry, *particularly as the President of a bank,* has been severely impaired because of the Comptroller's disapproval of Mr. Connelly's nomination." (emphasis added). These allegations are sufficient to support a claim of violation of Connelly's liberty interest in pursuing his chosen occupation. The government has failed to draw this court's attention to any-thing in the record that tends to show that a position as vice-president of a bank is substantially the same as being president of a bank.

Lastly, I would like to point out in passing that the majority opinion does not make it sufficiently clear that their holding that the Comptroller's Office investigators are entitled to qualified immunity does not affect Connelly's suit against the investigators in their official capacities.

The majority opinion ignores the clear language and implications of the *Vandygriff* case. I feel that *Vandygriff* controls the case before us, and we, as a panel, must follow it unless it is overruled *en banc.*

For the reasons and analysis above, I am of the opinion that the Comptroller's investigators did violate a clearly established right, and therefore I dissent from the majority's holding.