Revised March 16, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40412
Summary Calendar
_____

BRENT WHEELER,

Plaintiff-Appellant,

versus

DANIEL C. MILLER, DR.; C. SUE McCULLOUGH, DR.;
TEXAS WOMAN'S UNIVERSITY,

Defendants-Appellees.

_____

Appeal from the United States District Court for
the Eastern District of Texas

_____

March 9, 1999

Before REAVLEY, BENAVIDES and PARKER, Circuit Judges.

PER CURIAM:

Appellant Brent Wheeler was a graduate student at Texas Woman's University. After failing to obtain a Ph.D. in psychology, he sued the university and two professors, Dan Miller and C. Sue McCullough (collectively TWU), seeking injunctive relief and damages. The district court granted summary judgment in favor of TWU. We affirm.

BACKGROUND

In his live petition[1] Wheeler claimed that he was falsely accused of cheating, resulting in unfair treatment. Specifically, he claimed that false accusations of cheating resulted to inadequate grades, a punitive remediation plan, denial of participation in an internship program, and his ultimate dismissal from the program. He also complained that TWU never gave him a hearing on the cheating allegations. He alleged that "in contravention of the laws and constitutions of this state and of the United States, the Defendants without any form of due process continued to treat the Plaintiff as if he had cheated and should be subjected to punishment for same." Construing his petition liberally,[2] Wheeler asserted claims for violation of his state and federal due process rights, violation of his state and federal equal protection rights,[3] and defamation.[4] He sought injunctive relief and damages.

---

[1] Wheeler initiated suit in Texas state court. Appellees removed the case to federal court. Wheeler's third amended original petition was his last petition.

[2] Wheeler's briefing on appeal discusses gender discrimination and disability discrimination. Even under the most liberal reading his petition did not assert claims under these theories.

[3] The petition alleged that Wheeler "has been held to a different and higher standard than others in the doctoral program, and has been discriminated against without regard to due process over this unproven and unprovable accusation of cheating," that "[a] pattern of discrimination has been conducted by the university faculty which has resulted in the petitioner having experienced unfair treatment regarding grades and curriculum requirements in that all other students have been held to less strict standards than those of the Petitioner," and that "discrimination was perpetuated wherein other students have been permitted waivers from compliance with requirements which have been demanded of the petitioner."

[4] The petitioner alleged that Wheeler "has been subjected to slanderous conduct on the part of University faculty, (e.g. Dr. Miller, Dr. McCullough and others accusing the petitioner of cheating, a lack of cognitive ability supposedly arising from a closed head injury)."

The summary judgment record shows the following. Wheeler sought a Ph.D. in school psychology as a student in TWU's psychology department. He was originally admitted to TWU's master's program in counseling psychology in 1992. While a masters student he took a course in psychological assessment from defendant McCullough. This course is also required for the Ph.D., and included a one-hour "pre-practicum" field experience component, which involves administering tests to subjects. McCullough attested that she observed tapes of Wheeler's field tests and described his administration of the Wechsler Intelligence Scales as one of the worst she had ever observed. Wheeler received a C in the pre-practicum. McCullough attested that Wheeler fell asleep in class, to the point of snoring on one occasion, and that he frequently turned in his assignments late. She also attested that the rules of the course, as stated in the syllabus, prohibited the students from testing a family member, which is an ethical violation. Wheeler chose to test his brother, and later chose to use his brother when it was his turn to lead a "case staffing" in class, saying that the client was a friend.

McCullough attested that if a student's testing protocol had too many errors, the student was supposed to administer and score a new test of a subject. Her graduate assistant had informed her that Wheeler had not followed this requirement but had picked up his protocol and returned it fifteen minutes later with corrections and changes. The assistant expressed concern that an unusually high number of responses supposedly gathered from the test subject were word for word from the sample answers in the back of the testing manual.

Wheeler applied to the Ph.D. program in counseling psychology in 1994 and was turned down. He then successfully applied to the school psychology Ph.D. program. Defendants McCullough and Miller were on the school psychology program committee (SPPC) that admitted

3

Wheeler to the program. The other SPPC member were Drs. Hamilton, Jolly, and Vitro. McCullough voted against Wheeler's admission, expressing concerns about his performance in her class. McCullough admits that at this meeting she expressed concern about Wheeler's commitment to the field of school psychology as well as his "compliance with ethical and professional practice standards." Miller supported his admission, saying that everyone deserved a second chance, and offered to serve as his advisor. The committee voted to admit Wheeler, conditioned on his completion of his master's degree, retaking the psychological assessment pre-practicum, and registering for the introduction to school psychology course. Wheeler took the introduction to school psychology course from McCullough and received an A.

Wheeler offered evidence that another professor in addition to McCullough was concerned that Wheeler had fabricated test results, and that these concerns were discussed among faculty members. Dr. Jolly testified that McCullough's comments to her regarding Wheeler's "ethical problems" were an attempt to influence her opinion. Jolly testified that McCullough also expressed her concerns to Dr. Vitro, and Dr. Miller testified that Vitro was aware that accusations of academic dishonesty had been made against Wheeler, but Vitro himself testified that he was unaware of any rumors of academic dishonesty. Miller testified that discussions linking Wheeler to academic dishonesty occurred "at various stages." In a transcript of a conversation between Wheeler and Miller,[5] Miller states that "apparently, there was an accusation . . . brought against you that you were going out creating your own protocols, not seeing children, just making up protocols and apparently you were caught doing that and you had a big confrontation with Dr.

_____

[5] Miller surreptitiously tape-recorded several conversations between himself and faculty members.

4

Jackson about that." McCullough similarly testified that at a meeting Dr. Vitro had discussed "that there had been a problem with Dr. Jackson being concerned that Brent had done the same thing that I thought he had done, that is, that he had copied the answers from the test manual, that there were too many word-for-word responses . . . you just don't get that many that are word for word the same when you give it to an actual client . . . ." Wheeler testified that Drs. Miller and Jolly had told him of rumors concerning his academic dishonesty.

The school psychology graduate student handbook provides that any student who receives a C must undergo some form of remediation, and any student who earns two C's may be expelled.

After admission to the Ph.D. program, Wheeler took a course from defendant Miller. He received an A in the lecture portion and a B in the connected pre-practicum. In the fall 1994 semester Wheeler received a second graduate level C in a pre-practicum to a course by Dr. Vitro, the department chair. Vitro attested that the C was primarily a result of the inferiority of Wheeler's written logs. Although the student handbook provides for dismissal after a second C, the SPPC decided to place Wheeler in a remediation plan. The SPPC met with Wheeler and explained the plan, and also provided a written copy of the plan, which required the completion of certain course work, a comprehensive paper, and an oral exam, to be completed by certain dates. Wheeler was told that he would not be eligible to participate in an internship until the Fall of 1996 at the earliest. Dr. Hamilton, a member of the SPPC, attested that this first remediation plan was based on Wheeler's grades, and involved no discussion of cheating or unethical behavior.

On April 28, 1995, Wheeler took an oral comprehensive examination before Miller, McCullough, and Vitro. All three failed him. Miller described Wheeler's performance as the

5

worst he has ever seen. Vitro attested that he exercised professional judgment and acted in good faith, as did Miller and McCullough as far as he could tell.

In the Spring of 1995 Vitro gave Wheeler a C in a course due to a poor written exam, his third C in the graduate program. The SPPC met in June of 1995 to discuss Wheeler's status in the program. The committee decided to dismiss Wheeler from the program. McCullough attested that the basis of the decision was Wheeler's academic performance. The committee met with Wheeler a week later and informed him of its decision. However, the school administration advised the committee to reinstate Wheeler. As Miller and Vitro understood the administration's position, the original remediation plan was still in effect and technically did not address the possibility of other academic deficiencies (an additional C and failing the comprehensive exam) occurring after the plan was instituted.

After he was readmitted, Wheeler submitted a degree plan which required the submission of a transcript from the University of North Texas. Wheeler had been allowed to take courses at North Texas as a transfer student. He had received a fourth C in a graduate statistics course. In March of 1996 Wheeler took a second oral comprehensive exam before Dr. Palomares, Rubin, and Hampton. The orals committee was appointed by Dr. Sally Stabb; Wheeler offers no evidence that Stabb was aware of charges of academic dishonesty or was otherwise biased against Wheeler. All committee members failed Wheeler, and agreed his performance was the worst they had ever seen. Further, all three swore that they evaluated Wheeler in good faith and were unaware of any allegations of cheating or unethical conduct. The next day Wheeler signed a document accepting a doctoral internship with the Lewisville I.S.D. On April 2, 1996, Miller

6

wrote the school district, explaining that Wheeler "has not met all of his program requirements to be considered for placement as an intern during the 1996-1997 school year."

After Wheeler failed his second set of orals, Miller drafted a second remediation plan, attesting "that it was based solely on Wheeler's poor academic performance," and that "[t]he SPPC did not consider any allegations of unethical conduct in making their determination of the appropriate scope of remediation." TWU's graduate school catalog provides that "[s]tudents who fail any portion of the comprehensive exam process will be provided with remediation programs and subsequent measures for reevaluation of student progress. A student may be dismissed from a program if remediation is not completed in a satisfactory manner." The remediation plan required certain course work and applying to retake comprehensive exams by certain dates. On March 29, 1996 Wheeler met with the SPPC. By this time Dr. Palomares had replaced Dr. McCullough on the committee. According to Miller, Wheeler "was given the opportunity to address any concerns he had about his matriculation through the program at the March 29, 1996 meeting. The remediation plan was read to him and the rationale behind each activity was explained."

TWU does not dispute that the second remediation plan was unusually demanding. Wheeler appealed this plan to the dean of the graduate school. An ad hoc committee was appointed which unanimously affirmed the SPPC. Wheeler appealed to the vice president of academic affairs, who also affirmed. After Wheeler failed to enroll a course specified in the second remediation plan, the SPPC formally dismissed him from the graduate program. Miller, Hamilton, and Vitro all attested that the dismissal was based on Wheeler's failure to comply with the academic requirements of the second remediation plan.

7

DISCUSSION

Under modern summary judgment practice "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6] If the record as a whole could not lead a rational jury to find for the nonmoving party, there is no genuine issue for trial and summary judgment is warranted.[7] An appellate court applies the same standard in reviewing a summary judgment as that used by the trial court initially.[8] Based on our independent review of the summary judgment record, we conclude that a rational trier of fact could not find for Wheeler on any of his claims.[9]

A.    *Due Process*

1.    *Procedural Due Process*

In cases involving academic decisions, Texas courts interpreting the Due Course Clause of the Texas Constitution have looked to federal case law interpreting federal due process rights.[10] The federal procedural due process rights afforded students in an academic setting were explored

---

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

[7] *Capital Concepts Properties 85-1 v. Mutual First, Inc.*, 35 F.3d 170, 174 (5th Cir. 1994).

[8] *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997).

[9] Several issues of immunity under federal and state law are implicated in this case. Since we conclude that Wheeler's claims fail on their substantive merits, we need not address the immunity questions.

[10] *University of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995); *Ho v. University of Tex. at Arlington*, 1998 WL 767095, at *7 (Tex. App.–Amarillo Nov. 4, 1998, pet. for rev. filed Dec. 22, 1998).

in *Board of Curators of University of Missouri v. Horowitz.*[11] In *Horowitz*, the plaintiff, a medical student, was dismissed by school officials for failing to meet academic standards. Students at the medical school participated in rotations focusing on various medical specialties. Academic performance was evaluated by a faculty-student evaluation council. Recommendations of this council were reviewed by a faculty coordinating committee. Students typically were not allowed to appear before the evaluation council and coordinating committee.[12]

In her first year of study, several faculty members expressed dissatisfaction with the plaintiff's performance on one rotation. On the recommendation of the evaluation council, the student advanced to her second year on a probationary basis. Faculty dissatisfaction continued. The council concluded that the student not be considered for graduation in June, and recommended that, absent radical improvement, the student be dropped from the school. The student was allowed to take a set of oral and practical examinations as an appeal of the decision not to permit her to graduate. As part of this procedure, the student spent time with several practicing physicians. After receipt of recommendations from these physicians, the council reaffirmed its prior position. After later reviewing reports of her rotations, the council recommended that the student be dropped from the school. The coordinating committee and the dean approved the recommendation. Following the school's procedures, the student appealed the decision to the provost, who sustained the school's actions.[13]

---

[11] 435 U.S. 78 (1978).

[12] *Id*. at 79-80.

[13] *Id*. at 80-82.

The Court, assuming (as do we) that the student had a property or liberty interest subject to procedural due process protection, held that constitutional due process requirements had been met. Noting that the school had fully informed the student of the faculty's dissatisfaction with her clinical progress and that "[t]he ultimate decision to dismiss respondent was careful and deliberate," the Court found the procedures not only sufficient, but beyond the constitutional requirements of procedural due process.[14] By this minimal standard, TWU afforded Wheeler procedural due process. As detailed above, the school's decision to terminate him from the doctoral program was careful and deliberate, following a protracted series of steps to rate Wheeler's academic performance, identify and inform him of his weak performance, and, as in *Horowitz*, provide Wheeler with a specially tailored remedial program in light of his poor performance. The procedures were at least as careful and deliberate as those deemed more than sufficient in *Horowitz*.

Wheeler contends that TWU's decisions were tainted by the false accusations of cheating, which if true arguably transformed the decisions from "academic" to "disciplinary" decisions. The Court in *Horowitz* recognized that procedural requirements are less stringent for academic dismissals than for disciplinary dismissals.[15] However, any argument that the decisions made by TWU were disciplinary fails, in our view, to establish that summary judgment was improper, for two reasons.

First, as a factual matter, a rational trier of fact could not find that the actions taken by the SPPC in placing Wheeler in the remedial plans and ultimately dismissing him from the doctoral

---

[14] *Id.* at 84-85.

[15] *Id.* at 86-90.

10

program were disciplinary in nature. The decision to dismiss Wheeler was undisputably the result of his failure to comply with the course requirements of the second remedial plan. The second remedial plan was instituted only after Wheeler had received four C's in a program where two C's are grounds for expulsion, and had failed two oral comprehensive examinations. The first remedial plan was instituted after Wheeler had received two C's. Of these academic failings, Wheeler offers no direct summary judgment proof that allegations of cheating had anything whatever to do with failing the two oral exams. The evidence is uncontradicted that the three faculty members who administered the second oral exam were unaware of the cheating allegations, and all judged the performance the worst they had ever seen. As for the first oral exam, the most a rational finder of fact could conclude as to two members of the faculty panel – Vitro and Miller – is that they were aware of rumors of academic dishonesty but had not leveled such accusations based on their own dealings with Wheeler. Evidence of knowledge of rumors of academic dishonesty is "merely colorable"[16] and "is not significantly probative"[17] to defeat summary judgment on this issue in light of unequivocal sworn statements from Vitro and Miller that their evaluation of Wheeler was a good faith exercise of their professional judgment regarding Wheeler's academic performance. The same can be said for the two C's Wheeler received from Vitro. As for the C Wheeler received at North Texas, there is no evidence that this other institution had any knowledge of alleged academic dishonesty. This leaves Dr. McCullough, who gave Wheeler one of his four C's and was one of three faculty members who administered his first oral comprehensive exam. After a careful review of the evidence we conclude that a rational

---

[16] *Anderson*, 477 U.S. at 249.

[17] *Id*. at 249-50.

11

trier of fact would find that McCullough had numerous concerns about Wheeler as a student, including his academic ethics. Other concerns included his commitment to the field of school psychology, his sleeping in class, his turning in assignments late, the quality of his course work, and the quality of his presentation at the first oral comprehensive exam. On this record, a rational trier of fact could not conclude that the actions taken by the SPPC were disciplinary rather than academic.

Second, even if the decisions made by TWU can properly be characterized as disciplinary, the additional procedures required under federal law amount to nothing more than an informal hearing, that is, "an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'"[18] Unlike in *Horowitz*, in the pending case school personnel met with Wheeler when they set out the first remediation plan, when they informed him of their decision to dismiss him in 1995, and when they set out the second remediation plan. He was dismissed only after he plainly failed to meet the requirements of the second remediation plan.[19]

Wheeler alleged that TWU did not give him a separate hearing on the charges of cheating. Whether the alleged charges of cheating are themselves actionable as a due process violation is

_____

[18] *Horowitz*, 435 U.S. at 86 (quoting *Goss v. Lopez*, 419 U.S. 565, 584 (1975)).

[19] The Texas Supreme Court has held that under Texas law procedural due process requires something more than the *Goss* "informal give and take" when a graduate student is expelled for disciplinary reasons. *University of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 931 (Tex. 1995). Without deciding whether TWU met Texas standards for disciplinary dismissals, we conclude, as explained above, that a rational trier of fact could not find that Wheeler was dismissed for disciplinary reasons.

discussed below. We address here whether failure to hold a *hearing* on the charges is actionable as a procedural due process violation. The basis of a procedural due process claim is that the government, before depriving the plaintiff of a recognized property or liberty interest, failed to afford the plaintiff required procedures for challenging the government's action.[20] A claim that TWU failed to hold a hearing on the cheating allegations, therefore, can only amount to an actionable procedural due process claim if the university, after the time that a hearing would have been appropriate, proceeded to deprive Wheeler of a liberty or property interest because of the alleged cheating. The record does not support such a claim, since as discussed above, a rational jury could not find that the actions taken by TWU in placing him in remediation plans and ultimately dismissing him from the doctorate program were the result of cheating allegations.

Our conclusion is fully supported by the Supreme Court's decision in *Paul v. Davis*.[21] The Court found no support for "the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."[22] It found that simple defamation by a state official did not impose on the government the procedural due process requirement of a hearing; instead its prior holdings required that such defamation "occur in the course of the termination of

---

[20] *See Matthews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decision which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972) ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of a hearing is paramount.").

[21] 424 U.S. 693 (1976).

[22] *Id.* at 701.

13

employment" or in cases where "a right or status previously recognized by state law was distinctly altered or extinguished" before procedural due process rights were implicated.[23]  Hence, the mere allegations of cheating, without proof that the allegations led TWU to take actions altering Wheeler's status as a student, did not compel TWU to hold a hearing.

2.    *Substantive Due Process*

In addition to procedural due process rights, the Supreme Court recognized, in *Regents of University of Michigan v. Ewing*,  that decisions in the academic setting are subject to "a narrow avenue for judicial review" under a substantive due process standard.[24]  Under this narrow standard:

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.[25]

Courts must accept, as consistent with due process, "an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University . . . ."[26]

Under this standard, Wheeler does not come close to showing that TWU did not exercise professional judgment.  On this record a rational trier of fact could not find that TWU's treatment

---

[23] *Id*. at 710-11.

[24] 474 U.S. 214, 227 (1985).

[25] *Id*. at 225 (footnote, citations omitted).

[26] *Id*. at 227-28.

14

of Wheeler and ultimate decision not to award him a doctorate fell beyond the pale of reasoned academic decision-making in light of Wheeler's entire academic career.

Wheeler alleged that his poor grades, the remediation plans, and the ultimate decision to deny him a doctorate were all the result of the false accusations of cheating. Factually, we conclude that a rational trier of fact could not so find, as discussed above. Legally, for purposes of substantive due process, we do not see as relevant Wheeler's characterization of the actions taken as all linked to the cheating accusations. Even if Wheeler's characterization were correct, the actions taken by TWU were nonetheless "genuinely academic decision[s]"[27] under the *Ewing* substantive due process standard. While the Court in *Horowitz* noted that *procedural* due process requirements for students may vary depending on whether the action taken is "disciplinary" versus "academic," all of the decisions taken by TWU – those regarding grades, the remediation plans, and the award of a degree – are genuine academic decisions under *Ewing*. *Ewing*, in delineating a student's substantive due process rights, did not hold that genuine academic decisions and the standard for judicial review of such decisions are limited only to those decisions based purely on test scores or some other objective academic criteria. It noted that the academic decision in issue might reasonably have been based on university concerns about the student's "lack of judgment and an inability to set priorities," and that the university promotion and review board "was uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and was thus especially well situated to make the necessarily subjective judgment of [his] prospects for success in the medical profession."[28]

---

[27] *Id*. at 225.

[28] *Ewing*, 474 U.S. at 227 n.13, 228 n.14.

15

### 3. *"Stigma" Due Process Claim*

The remaining due process question is whether the alleged false allegations of cheating, in an of themselves, can amount to a due process violation. Wheeler did not specifically allege such a "stigma" due process claim; in any event summary judgment was appropriate on such a claim. At the outset, *Paul* found that "the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."[29] It held that a plaintiff's "charge that [defendants'] defamation of him, standing alone and apart from any other action with respect to him," did not state a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment.[30] As explained above, a rational trier of fact could not find that TWU took any action jeopardizing his status as a student as a result of the alleged cheating allegations. Absent "an infringement of some other interest,"[31] defamation by itself is not actionable.

Defamation by the government might be actionable even where the government itself does not take action adverse against the plaintiff by altering the plaintiff's status as an employee or student. We have stated, in this context, that "excluding a person from an occupation by making false defamatory statements is actionable."[32] However, in cases where the plaintiff claims that the government's defamation has impaired his ability to pursue an occupation, the plaintiff must show

---

[29] *Paul*, 424 U.S. at 702 (footnote omitted).

[30] *Id*. at 695.

[31] *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991).

[32] *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983).

16

that the defamatory statement was publicly disclosed.[33]  The only evidence of a publication

outside the university community is the April 2, 1996 letter, discussed above.  The letter states

that Wheeler "has not met all of his program requirements to be considered as an intern during the

1996-97 school year."  To support a stigma claim the state actor must make "concrete, false

assertions of wrongdoing on the part of the plaintiff," and the charge of wrongdoing "must be

worse than merely adverse; it must be such as would give rise to a badge of infamy, public scorn,

or the like."[34]  As a matter of law, the statements made in the April 2 letter are not sufficiently

stigmatizing to support a stigma due process claim.[35]

Further, to establish a stigma due process claim, the plaintiff must prove, among

other elements, that the defamatory charges made against him were false.[36]  "[C]onclusory

allegations unsupported by concrete and particular facts will not prevent an award of summary

judgment."[37]  Wheeler failed to offer sworn summary judgment evidence of concrete and

particular facts, showing the falsity of the alleged defamatory statements made by the faculty.  For

example, McCullough attested that her graduate assistant had seen Wheeler take a test that he

was supposed to administer again to a test subject, and return fifteen minutes later with

---

[33] *Blackburn v. City of Marshall*, 42 F.3d 925, 936 n.10 (5th Cir. 1995); *Bank of Jackson County v. Cherry*, 980 F.2d 1362, 1367 (11th Cir. 1993).

[34] *Blackburn*, 42 F.3d at 936 (internal quotations omitted).

[35] *Id.*; *see also Connelly v. Comptroller of Currency*, 876 F.2d 1209, 1215 (5th Cir. 1989) (holding that letter by defendant stating that "we are of the opinion that [plaintiff] does not possess the qualifications for the position" was insufficient to support stigma due process claim).

[36] *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993).

[37] *Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir. 1995).

corrections. According to McCullough, the assistant expressed concern that an unusually high number of responses supposedly gathered from the test subject were word for word from the sample answers in the back of the testing manual. McCullough also attested that, in violation of the rules of her course and ethical standards, Wheeler had twice used a family member as a test subject. The record offers no sworn summary judgment proof that these events did not occur. Similarly, Wheeler offered evidence that Miller had told him that "apparently, there was an accusation . . . brought against you that you were going out creating your own protocols, not seeing children, just making up protocols and apparently you were caught doing that and you had a big confrontation with Dr. Jackson about that." The record is devoid of sworn, concrete summary judgment evidence that this accusation by Dr. Jackson was false.

B.      *Equal Protection*

We are not convinced that Wheeler has even asserted a cognizable equal protection claim. While his petition alleges a "pattern of discrimination" and that Wheeler "has been discriminated against," his petition did not allege discrimination based on his membership in a particular class. Ordinarily equal protection claims are premised on allegations of such class-based discrimination.[38] In essence, Wheeler claims that he was individually singled out for unfair treatment – that he is a "class of one." Whether equal protection rights extend to such claims simply because the plaintiff claims "discrimination" is unclear.

_____

[38] *See, e.g., Plyler v. Doe*, 457 U.S. 202, 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation."); *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'") (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)); *Labat v. Bennett*, 365 F.2d 698, 723 (5th Cir. 1966) ("The equal protection clause prohibits a state from making arbitrary and unreasonable classifications.").

18

Regardless, the equal protection rights afforded by state law mirror federal law.[39]  Under federal law, the Equal Protection Clause essentially directs that all persons similarly situated be treated alike.[40]  Generally, to establish an equal protection claim the plaintiff must prove that similarly situated individuals were treated differently.[41]  Unless a suspect class or fundamental right is involved, we generally employ the rational basis test in deciding equal protection claims.[42]

For the same reasons that appellees' conduct passes scrutiny under a substantive due process analysis, it also survives rational basis equal protection scrutiny, assuming that such scrutiny is even appropriate in these circumstances.  We have recognized that the deference afforded decisions in an academic setting under substantive due process review "extends as well to cases in which the plaintiff asserts he has been denied equal protection because the faculty erred in evaluating his qualifications as compared to those of another candidate."[43]

Further, Wheeler could point to no individual with a similarly poor academic performance who was awarded a doctorate.  For example, he concedes that no other student has ever failed comprehensive oral examinations.  While Dr. Jolly testified that the faculty was "expecting some things of [Wheeler] they had not expected from other students," under our deferential review of academic decisions we cannot say that closer scrutiny of Wheeler or special expectations were unwarranted in light of his overall academic performance.  In *Ewing* the Court warned that "we

[39] *Rose v. Doctors Hospital*, 801 S.W.2d 841, 846 (Tex. 1990).

[40] *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

[41] *Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992).

[42] *Hilliard v. Ferguson*, 30 F.3d 649, 652 (5th Cir. 1994).

[43] *Levi v. University of Tex. at San Antonio*, 840 F.2d 277, 280-81 (5th Cir. 1988).

are not in a position to say that" other students were "similarly situated" with the plaintiff, in light of "[t]he insusceptibility of promotion decisions such as this one to rigorous judicial review."[44]

C.    *Defamation*

A claim of defamation under state law must also fail.  Texas recognizes a qualified privilege for "statements that occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist that another, sharing that common interest, is entitled to know."[45]  Hence, "a communication made on a subject matter in which the person making it has an interest is privileged if made to persons having a corresponding interest or duty."[46]  Communications by faculty members to the SPPC or among members of the SPPC were subject to the qualified privilege, since the faculty members shared a common interest in Wheeler's progress as a student and his qualifications for a degree.[47]  The only communication in the record to a third party is the April 2, 1996 letter to the Lewisville I.S.D., stating that Wheeler "has not met all of his program requirements to be considered for placement as an intern during the 1996-1997 school year."  We conclude that this communication is also protected by the privilege, since the school district and TWU shared a common interest in

---

[44] *Ewing*, 474 U.S. at 228 n.14.

[45] *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 92 (Tex. App.–Dallas 1996, writ denied).

[46] *Danawala v. Houston Lighting & Power Co.*, 14 F.3d 251, 254 (5th Cir. 1993).

[47] *See Baldwin v. University of Tex. Med. Branch at Galveston*, 945 F. Supp. 1022, 1036 (S.D. Tex. 1996) (faculty evaluations of medical resident subject to qualified privilege), *aff'd*, 122 F.3d 1066 (5th Cir. 1997) (unpublished table decision); *Koerselman v. Rhynard*, 875 S.W.2d 347, 353 (Tex. App.–Corpus Christi 1994, no writ) (statements about faculty member made by department chair to dean and tenure committee subject to privilege).

20

Wheeler's qualifications for an internship that was part of his graduate program. We are convinced that Texas courts would recognize a qualified privilege in these circumstances, since they routinely recognize the privilege in the analogous circumstance of an employer providing a reference on a former employee to a prospective employer.[48]

"Proof that a statement was motivated by actual malice existing at the time of publication defeats the privilege. In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth."[49] To survive summary judgment, the burden was on Miller to offer proof of actual malice.[50] We conclude that a rational trier of fact could not find that TWU and its faculty acted with malice. While there is evidence suggesting that Drs. McCullough and Jackson believed Wheeler had engaged in acts of academic dishonesty, and had accused him of such, Wheeler offered no concrete, sworn summary judgment evidence that the accusations were false, as explained above, much less that they were made with knowledge of their falsity or with reckless disregard for the truth. Likewise, as for the April 2, 1996 letter, Wheeler offered no proof that the statements in the letter were false, much less that they were made with knowledge of their falsity or with reckless disregard for the truth.

AFFIRMED.

---

[48] *See Free v. American Home Assurance Co.*, 902 S.W.2d 51, 55-56 (Tex. App.–Houston [1st Dist.] 1995 , no writ); *Pioneer Concrete of Texas, Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex. App.–Houston [14th Dist.] 1993, writ denied); *Smith v. Holley*, 827 S.W.2d 433, 436 (Tex. App.–San Antonio 1992, writ denied).

[49] *Randall's Food Market, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (citations omitted).

[50] *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 314 (5th Cir. 1995).

21